**VULCAN HART CORPORATION (ST. LOUIS DIVISION), Petitioner,**

**v.**

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 82–1719.

United States Court of Appeals, Eighth Circuit.

Submitted April 12, 1983.

Decided Oct. 4, 1983.

Rehearing Granted Nov. 21, 1983.

---

Law Offices of Gerald Tockman, A Professional Corp., Gerald Tockman, Louis N. Laderman, St. Louis, Mo., for petitioner Vulcan-Hart Corp. (St. Louis Div.).

Peter Winkler, Atty., William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., for respondent.

Before BRIGHT and FAGG, Circuit Judges, and JONES, District Judge.*

---

* JOHN B. JONES, United States District Judge· for the District of South Dakota, sitting by designation.

BRIGHT, Circuit Judge.

Vulcan-Hart Corporation, St. Louis Division (V–H or the Employer) petitions for review of an NLRB decision finding that V–H committed numerous unfair labor practices in connection with a strike by its employees which began in September of 1979. The appeal presents several issues, including whether the NLRB correctly found (1) that the strike was converted from an economic to an unfair labor practice strike when V–H unlawfully discharged strikers and withdrew recognition from the Union,[1] (2) that V–H improperly denied seniority to returning strikers, and (3) that V–H improperly conditioned reinstatement of William Lindhorst on his resignation from union office. We enforce the NLRB's order in part and deny enforcement in part.

I. *Background.*

Since before 1970, V–H and Local 110 had entered into a series of collective bargaining agreements, the most recent of which expired September 21, 1979.[2] Despite extensive negotiations, the parties were unable to reach a new agreement by September 21. Accordingly, at midnight on September 21, all but three members of the approximately thirty-seven member bargaining unit went on strike.

On October 3, the parties arranged a negotiation session with federal mediator James Kelly. At the meeting, general manager Richard Klohr and attorney Gerald Tockman represented V–H. The Union negotiating committee consisted of International Vice-President Robert Voelkel, and from the Local, William Lindhorst, Marvin Miller, and Happy Oatman. The parties reached a tentative agreement, which the union negotiators indicated they would recommend to their membership.

Immediately following the negotiations on October 3, Kelly met with Tockman, Voelkel, and Lindhorst and expressed some concern that Lindhorst's status as a discharged employee might adversely taint the responses of the other union members to his proposals. V–H had fired Lindhorst for insubordination in April of 1979. Nonetheless, Lindhorst was elected president of Local 110 in July of 1979, and at the time the strike began, he was awaiting arbitration of his grievance challenging his discharge. According to Lindhorst, both at the October 3 meeting and on the following day when he met with Klohr, V–H offered to reinstate him with full seniority but without backpay, if he would resign his union presidency, agree not to run for union office for three years, and drop his grievance. Lindhorst refused, preferring to proceed with his arbitration.[3]

The employees did not agree to the contract proposal resulting from the October 3 meeting, so the parties arranged another meeting with Kelly for October 12. At this meeting, V–H made additional concessions, and the parties reached a new tentative agreement. On October 15, the employees rejected this proposal too, by a vote of 34–2. On October 16, V–H sent a letter to all the strikers soliciting them to return to work. V–H asserted that the October 12 agreement was its final offer, and promised that the conditions in the proposed agreement would apply to all returning employees. V–H also warned that it intended to resume operations on October 22, and would begin hiring permanent replacements on that date, if necessary.

Between October 22 and 30, four strikers returned to work, and V–H hired twenty-three permanent replacements. During this time, certain union members sought reconsideration of the final contract propos-

---

1. The striking employees are members of the Stove, Furnace, and Allied Appliance Workers International Union, Local 110 (Local 110 or the Union).

2. All subsequent dates refer to 1979 unless otherwise indicated.

3. The arbitrator eventually decided the grievance in Lindhorst's favor, ordering that V–H reinstate him with full backpay, except for a 30-day suspension. *See Vulcan-Hart Corp. v. Stove, Furnace & Allied Appliance Workers International Union, Local 110,* 671 F.2d 1182 (8th Cir.1982) (enforcing arbitrator's award).

al, and on October 25, the Union again voted to reject it, 28–5.

On October 30, V–H sent identical letters to nineteen of the strikers informing them that their employment was "terminated" because they had been permanently replaced, and that if they wished to return to work, they must reapply as "new employees."[4] Thereafter, V–H sent copies of this letter to the fourteen other strikers it replaced during the first half of November. In hiring permanent replacements, V–H matched each replacement with a specific striker and replaced the strikers in order of increasing seniority. Thus, it replaced the least senior striker first, the second-least senior striker next, and so on. Under V–H's reinstatement policy, returning strikers retained their previously accrued seniority for all purposes except layoff and recall.

As of November 4, striker-returnees and twenty-four permanent replacements were at work at V–H, while some thirty-three employees remained out on strike. On November 1, V–H formally withdrew its recognition of Local 110 as the employees' bargaining agent, claiming to have a good-faith doubt of the union's majority status. The strike has apparently never been settled.

On November 2, the Union filed unfair labor practice charges with the NLRB. Administrative Law Judge Thomas A. Ricci presided over a hearing on the charges, and entered a decision in favor of the Union.

The NLRB affirmed in orders entered June 14, 1982 (262 NLRB No. 17) and August 17, 1982 (263 NLRB No. 64). The orders held that V–H had violated sections 8(a)(1), (3), and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3), and (5), by discharging strikers on and after October 30, by withdrawing recognition of the Union on November 1, by denying seniority to returning strikers, and by conditioning reinstatement of Lindhorst on his resigning from union office. The NLRB determined that the economic strike had become an unfair labor practice strike as of either October 30 or November 1, and ordered reinstatement of all strikers with full backpay. This appeal followed.

## II. *Issues.*

In reviewing the NLRB's order, we must determine whether the Board correctly applied the law and whether its findings of fact are supported by substantial evidence on the record considered as a whole. *See* 29 U.S.C. § 160(e). *See also Universal Camera Corp. v. NLRB,* 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). This appeal disputes primarily the Board's factual findings, which we believe largely meet the substantial evidence standard.

### A. *Conduct of the Hearing.*

V–H charges that it did not receive a fair hearing because the Administrative Law

---

**4.** The text of the letter reads, in pertinent part:

Dear

This is to inform you that your employment with this Company has been terminated by the hiring of a permanent employee to replace you. Although we regret this ending of our working relationship, we have been forced to do this for the reasons set out in our October 16, 1979 letter advising you of our decision to resume operations and hire replacements.

\* \* \* \* \* \*

Your name and current address and telephone number will be maintained on our Company records, should job openings for which you may be qualified as a new employee become available in the future. In order to properly maintain our records and to provide to you a first opportunity for application as a new employee on job openings, you are requested to advise us of any change in address or telephone number. Also, in order to make available to others who are being replaced such first opportunities for employment with this Company, you are directed to keep us advised, in writing, not less than every three (3) months of your availability for work here or whether you have become employed elsewhere.

This letter is being provided to you so that you can fully understand your situation, the fact that your employment has been terminated and what must be done by you with regard to insurance. In addition, you are being provided with this information so that you can understand that you should seek employment elsewhere, at this time.

We wish you well in whatever new employment you may obtain.

General Counsel's Exhibit 10.

Judge acted in a biased and prosecutorial manner. V–H also complains that the Administrative Law Judge improperly excluded relevant evidence. In particular, V–H claims that it should have been permitted to introduce evidence to show that Lindhorst wanted to prolong the strike out of personal animosity towards Klohr, the man responsible for Lindhorst's discharge.

■ After carefully examining the record, we conclude that, although the Administrative Law Judge may have injected his personality into the proceedings to a greater degree than is ordinarily desirable, his conduct of the hearing did not amount to a denial of due process. To the extent that admissible evidence was incorrectly excluded, such exclusion was harmless error, because V–H had an adequate opportunity to present its theory of the case.

■ On several occasions V–H attempted to elicit testimony concerning internal union communications, in order to show that some union members thought Lindhorst was misrepresenting the contract negotiations and had improper motives for promoting the strike. V–H had not charged the Union with failure to bargain in good faith, but instead offered the testimony as relevant to its defense of good-faith doubt of the union's majority status. The Administrative Law Judge excluded the evidence of internal union communications for that purpose, while admitting all testimony concerning communications between union members and V–H officials. On appeal, V–H argues that the excluded evidence should have been admitted as relevant to the question whether the strike was prolonged for unprotected (as opposed to protected) reasons. (*See* discussion of conversion to unfair labor practice strike, Section C, *infra*.) Given our resolution of the unfair labor practice strike issue, even if the exclusion of such evidence was improper, it was harmless error.

■ V–H also mounts a general challenge to the Administrative Law Judge's credibility determinations, arguing that they are groundless and unworthy of defer-ence. We disagree. V–H has not shown, nor does the record disclose, the extraordinary circumstances necessary to overcome our traditional deference to the Board's credibility determinations. *See NLRB v. Quick Find Co.,* 698 F.2d 355, 359 (8th Cir. 1983).

**B.** *Discharges and Seniority Denial.*

V–H denies that it ever discharged strikers, treated them as new employees, or failed to reinstate them. In V–H's view, the letter which it first sent to some of the strikers on October 30 simply outlined its legitimate intention to hire permanent replacements. Despite the admittedly strong language in the letter, V–H claims that it never discharged any strikers, that their employment files remained open after they were replaced, and that any striker requesting reinstatement was in fact reinstated.

The NLRB responds that the October 30 letter was clearly a discharge letter, telling employees that they were "terminated," that they would be rehired only as "new employees," and that they must keep V–H informed of their current availability for work. Furthermore, the NLRB asserts that V–H's denial of seniority to returning strikers for purposes of layoff and recall is inconsistent with V–H's contention that it offered full reinstatement to returning strikers.

■ The legal parameters of an employer's replacement rights are well-defined. The right to hire permanent replacements has been characterized as "one of the employer's primary weapons during an economic strike." *Belknap, Inc. v. Hale,* —— U.S. ——, ——, 103 S.Ct. 3172, 3177, 77 L.Ed.2d 798 (1983). However, economic strikers remain "employees" after replacement, within the statutory definition set forth in 29 U.S.C. § 152(3), and they are entitled to reinstatement as vacancies arise, although they may not displace permanent replacements. *See Randall, Div. of Textron, Inc. v. NLRB,* 687 F.2d 1240, 1244 (8th Cir.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 1892, 77 L.Ed.2d 282 (1983). Unfair labor practice strikers, on the other

hand, are entitled to reinstatement with backpay despite the fact that they have been replaced. *See Mastro Plastics Corp. v. NLRB,* 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956).

■ Although the October 30 letter does contain some references to termination of employment, we do not agree that it necessarily operated as a discharge letter, especially in view of V–H's treatment of strikers who chose to return to work. They were reinstated to available positions with full seniority for purposes of economic benefits, though not for purposes of layoff and recall. Thus, it appears that V–H did not view returning strikers as new employees or discriminate against them on the basis of their alleged "discharges," except possibly with respect to seniority. Thus, we do not find that V–H committed an unfair labor practice by sending out its October 30 letter, and accordingly, the strike could not have been converted to an unfair labor practice strike on that day.

■ We affirm, however, the NLRB's holding that V–H's partial denial of seniority constituted an unfair labor practice under section 8(a)(1). V–H asserts a justification for the denial: it served to enhance the job security of the permanent replacements V–H hired during the strike. But opposed to this interest are the strikers' rights under the Labor Act. Section 2(3), 29 U.S.C. § 152(3), provides that strikers remain employees even during the pendency of the strike. On reinstatement, they do not *become* employees of their employer, for they have *been* its employees all along. If the employer can, on reinstatement, deny economic strikers the benefits they had accrued prior to the strike (thus treating them in that respect like new hires), it can deny them the protection which the statutory guaranty of continuing employee status implies. V–H, of course, restored many of the seniority rights of the reinstated strikers,

and offers a justification for denying the others. But the Labor Act commits to the NLRB the task of balancing the employer's proffered justification against the strikers' rights to full reinstatement. Unless the Board has clearly misapplied the law, this court will not overturn its decisions in such cases. *See Randall, Div. of Textron, Inc. v. NLRB, supra,* 687 F.2d at 1244–45.

We do not think the Board has clearly misapplied the law here. The cases supply ample support for a holding that denial of accrued rights and benefits to reinstated strikers constitutes an unfair labor practice. *See, e.g., NLRB v. Great Dane Trailers,* 388 U.S. 26, 87 S.Ct. 1792, 18 L.Ed.2d 1027 (denial to strikers of previously accrued vacation rights which employer grants to nonstrikers, returning strikers, and replacements violates §§ 8(a)(1) and (3)); *NLRB v. Pepsi-Cola Bottling Co. of Topeka,* 613 F.2d 267, 271 (10th Cir.1980) ("Once rehired, economic strikers regain their seniority and other benefits, essentially the same as if they had been laid off in a force reduction and then recalled"; denial of such benefits violates the Act). Though we need not say that an employer can *never* justify laying reinstated strikers off before it lays off replacement workers, neither can we say that, on the facts of this case, the Board clearly misapplied the law.[5]

C. *Recognition Withdrawal—Conversion to Unfair Labor Practice Strike.*

The Board alternatively found that the strike was converted to an unfair labor practice strike when V–H withdrew recognition of the Union on November 1. This finding raises two issues: whether the Board correctly found that V–H did not have a good-faith doubt of the Union's majority status, and whether V–H's withdrawal of recognition aggravated or prolonged the strike.

---

5. We regard V–H's reliance on *Giddings & Lewis, Inc. v. NLRB,* 675 F.2d 926 (7th Cir. 1982), as misplaced. The court there held that an employer could call back laid-off replacements before it called back *unreinstated* strikers. Because the employer *had* restored full seniority to the strikers it did reinstate, the court in *Giddings & Lewis* never had to face the question before us in this case—whether an employer can deny reinstated strikers their accrued seniority for purposes of layoff and recall.

■ The Union in this case was entitled to a presumption of majority status, which the employer could rebut by showing either an actual lack of majority support or a reasonable, good-faith doubt of the Union's majority. *See, e.g., Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1109–10 (1st Cir.1981); *National Cash Register Co. v. NLRB,* 494 F.2d 189, 194 (8th Cir.1974). V–H could not demonstrate that the Union in fact represented less than a majority of the employees on November 1, but it contends that it had a good-faith doubt of the Union's majority, grounded in a variety of factors. As of November 1, twenty-four permanent replacements and four returned strikers were at work at V–H. The four returned strikers had resigned from the Union, and V–H presumed that the twenty-four replacements would not support the Union. *See National Car Rental System, Inc. v. NLRB,* 594 F.2d 1203, 1206 (8th Cir.1979). Of the remaining thirty-three employees still on strike, V–H claimed that it believed two strikers had secured employment elsewhere, three others had engaged in picket line misconduct, and five more wished to return to work at V–H. Deducting all these "doubtful" supporters from the Union's total, V–H concludes that it had a reasonable basis for doubting the Union's majority.

■ While it may be reasonable to presume that the returned strikers and replacements did not support the Union, they alone did not outnumber the remaining strikers as of November 1. *Cf. Soule Glass and Glazing Co., supra,* 652 F.2d at 1111 (replacements numbered 29 to strikers' total of 22). Thus, the reasonableness of V–H's withdrawal of recognition depends on whether it had justification for believing that several strikers were disaffected with the Union. This is a question of fact, which the NLRB resolved in the Union's favor. The record contains substantial evidence supporting the NLRB's finding. V–H's evidence of employee disaffection consisted largely of uncorroborated hearsay reports, some of which may have been received after V–H withdrew recognition. In these circumstances, we will not overturn the Board's finding that V–H failed to show that it had a good-faith belief that the Union had lost its majority status. Therefore, the Board's holding that V–H's withdrawal of recognition on November 1 violated section 8(a)(5) stands.

■ In order for an economic strike to be converted to an unfair labor practice strike, the employer's unfair labor practices must aggravate or prolong the strike. *See National Car Rental System v. NLRB, supra,* 594 F.2d at 1207. V–H contends that the Union's strike remained an economic strike after November 1, because the subject matter on the picket signs remained the same, and the strikers affirmed that they would not return until the Union and V–H agreed on a contract.

■ Whatever goals the strikers hoped to accomplish by striking, V–H's withdrawal of recognition clearly prolonged the strike, because it put an end to contract negotiations. To our knowledge, this strike has never been formally settled, and that failure is directly attributable to V–H's premature withdrawal of recognition. Substantial evidence therefore supports the Board's finding of conversion to an unfair labor practice strike on November 1.

### D. *Lindhorst.*

V–H disputes the Board's finding that it violated sections 8(a)(1) and (3) by making Lindhorst's reinstatement conditional on his resignation from union office. V–H contends that the violation is not supported by substantial evidence, but even if it were, V–H argues, the backpay award was inappropriate, because the complaint charged a violation of section 8(a)(1) only.[6]

■ With respect to the Board's findings of fact, this issue turns entirely on credibility determinations. The Board spe-

---

**6.** In fact, at the hearing, the general counsel specifically denied that the Board sought backpay for Lindhorst on section 8(a)(3) grounds. We address the Board's failure to seek relief under section 8(a)(3) in our discussion of the appropriate remedy, Section E, *infra.*

cifically credited Lindhorst's version of the reinstatement offer, and we find no ground for overturning the Board's credibility determinations in this case. The question has arisen also whether evidence relating to the reinstatement discussions should have been admitted at all, since one might characterize the discussions as compromise negotiations within the scope of Fed.R.Evid. 408.[7] But Rule 408 excludes evidence of settlement offers only if such evidence is offered to prove liability for or invalidity of the claim under negotiation. To the extent that the evidence is offered for another purpose, and to the extent that either party makes an independent admission of fact, the evidence is admissible.

■ In this case, the demand that Lindhorst resign his union office arose in the context of negotiations to settle his discharge grievance. The discharge claim is not at issue in this proceeding. Accordingly any statements V–H made in the course of the negotiations are not excludable under Rule 408. With the admission of those statements, the record clearly supports the finding that V–H attempted to coerce Lindhorst into restricting his participation in organizational activities, in violation of section 8(a)(1).

### E. *Remedy.*

V–H contends that the remedy the NLRB imposed is punitive, not remedial, and therefore should not be enforced. V–H argues that Lindhorst is not entitled to backpay from October 3, and that none of those still on strike should receive either backpay or reinstatement. We think the remedy was overbroad with respect to Lindhorst, but not with respect to the other strikers.

■ The NLRB's general counsel charged V–H on Lindhorst's account under section 8(a)(1) only, and specifically denied at the hearing that it sought backpay for Lindhorst from the time of the October 3 resignation demand. *See* n. 6 *supra.* The

NLRB erred in awarding backpay and reinstatement from October 3, because the strike had not been abandoned at that point, and did not become an unfair labor practice strike until November 1. From November 1, however, all strikers including Lindhorst are entitled to reinstatement and backpay. V–H argues that the strikers who never abandoned the strike are not entitled to reinstatement or backpay. We disagree. V–H itself guaranteed that the strike would never be resolved when it withdrew its recognition of the Union. It cannot now escape responsibility for its unfair labor practices by arguing that the strikers did not settle, since V–H's refusal to negotiate is itself part of the reason they still remain on strike.

### III. *Conclusion.*

We enforce the Board's order in part and deny enforcement in part, in accordance with this opinion.

---

**7.** Under 29 U.S.C. § 160(b), the NLRB must conduct its hearings in accordance with the Federal Rules of Evidence, "so far as [is] practicable." But though the federal rules carry

great weight, they do not absolutely bind on the NLRB. *See, e.g., NLRB v. Maywood Do-Nut Co., Inc.,* 659 F.2d 108, 110 (9th Cir.1981) (per curiam).