NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

CHAMP CORPORATION, Respondent.

No. 89–70160.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 8, 1990.

Decided Aug. 29, 1990.

As Amended on Denial of Rehearing
and Rehearing En Banc May 20, 1991.

Scott D. McDonald, N.L.R.B., Washington, D.C., for petitioner, N.L.R.B.

Margo A. Feinberg, Schwartz, Steinsapir, Dohrman & Sommers, Los Angeles, Cal., for petitioner-intervenor, United Auto., Aerospace and Agr. Implement Workers of America.

Thomas S. Kerrigan, Timothy F. Ryan, Steven W. Brennan, McLaughlin and Irvin, Los Angeles, Cal., for respondent, Champ.

Before ALARCON, BRUNETTI and O'SCANNLAIN, Circuit Judges.

ALARCON, Circuit Judge:

The National Labor Relations Board (Board) has applied to this court for enforcement of its Decision and Order entered on November 25, 1988. The Board found that Champ Corporation (Champ) committed unfair labor practices by discharging employees while they conducted an economic strike. The Board concluded that these unfair labor practices converted the employees' economic work stoppage into an unfair labor practice strike. As a

result, the Board ordered, *inter alia,* that Champ cease and desist all unfair labor practices and reinstate all striking employees with backpay from the date of their unconditional offer to return to work.

Champ contends that substantial evidence does not support the Board's finding that any striking employees were fired during the economic strike. Champ also argues that the Board erred as a matter of law in concluding that the alleged discharge of the employees converted an economic work stoppage into an unfair labor practice strike.

The primary issue we must decide is whether Champ's conduct in discharging certain striking employees converted an economic work stoppage into an unfair labor practice strike by expanding the issues in dispute to include a protest regarding the company's alleged unfair labor practices thereby aggravating or prolonging the strike. We conclude that the Board's finding that economic strikers were discharged is supported by substantial evidence and that this conduct became a contributing factor in expanding the issues in this labor dispute thereby delaying settlement. We discuss each issue and the facts pertinent thereto under separate headings.

I

### SUBSTANTIAL EVIDENCE OF UNFAIR LABOR PRACTICES

Champ asserts that the Board's finding that the company was guilty of unfair labor practices because certain employees were discharged on or before October 25, 1979 is not supported by substantial evidence. We disagree.

■ We must uphold the Board's decision if its factual findings are supported by substantial evidence and if it has correctly applied the law. *NLRB v. Howard Elec. Co.,* 873 F.2d 1287, 1290 (9th Cir.1989); *Lippincott Indus., Inc. v. NLRB,* 661 F.2d 112, 114 (9th Cir.1981). If there is evidence to support two conflicting views, the Board's findings must be allowed to stand

even though we might have reached a different conclusion on our own. *NLRB v. Pacific Grinding Wheel Co.,* 572 F.2d 1343, 1347 (9th Cir.1978). Credibility findings are entitled to special deference and may only be rejected when a clear preponderance of the evidence shows they are incorrect. *Lippincott,* 661 F.2d at 114.

#### A. *The Discharge of Baugh and Naranjo*

Because contract negotiations reached an impasse on economic issues, the International Union, United Automobile, Aerospace, and Agricultural Implement Workers of America—UAW, Local No. 509 (the Union) ordered a work stoppage on October 15, 1979. Prior to that date, on October 3, 1979, Tom Simovich, Champ's general manager, presented a list to a deputy sheriff containing the names of nine employees. Simovich told the officer that these employees might cause problems in the event of a strike. Steven Baugh's name was on the list.

■ On October 17, 1979, Baugh and Jose Naranjo were picketing in front of one of Champ's buildings. Tom Simovich came out of the building and spoke to Naranjo. He told Naranjo that "he might as well go home" because he "didn't work here anymore." Baugh said "what about me, Tom?" and Simovich replied "[y]ou're fired, too. You might as well go home." Simovich then told Baugh and Naranjo that he would have them arrested if they did not leave. Baugh asked Simovich why he was fired but Simovich did not reply. Baugh then told Simovich, "[w]e still love you, Tom. We just want a contract." Simovich testified that he had had no conversation with Baugh or Naranjo during the first week of the strike. The ALJ found that Simovich's testimony was not credible.

The Board concluded that the testimony of Baugh and Naranjo was sufficient to show that they were discharged in violation of sections 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), (3) (the Act).[1] The Board stated that "Si-

---

1. **§ 158. Unfair labor practices**

a) It shall be an unfair labor practice for an employer—

movich's remarks were entirely unequivocal in character, were phrased as an immediate discharge, were accompanied by a direction to leave the employment site with a concurrent threat of arrest, and were uttered by a high management official so as to lend credence to the finality of the action taken."

Champ contends that there is substantial evidence in the record that supports a finding that Baugh and Naranjo did not believe that they had been discharged. Champ characterizes the conversation among Simovich, Baugh, and Naranjo as a jovial, facetious exchange. As further proof that no discharge occurred, Champ notes that Baugh and Naranjo continued picketing and reported for reinstatement on April 21, 1980, and that Baugh continued serving as a member of the Union's negotiating team. In addition, Champ contends that the letter sent to all striking employees on October 30, 1979 requesting them to return to work demonstrates that Baugh and Naranjo were not discharged on October 17, 1979.[2]

"No set words are necessary to constitute a discharge; words or conduct, which would logically lead an employee to believe his tenure had been terminated, are in themselves sufficient." *NLRB v. Cement Masons Local No. 555*, 225 F.2d 168, 172 (9th Cir.1955). "The test of whether an employee has been discharged depends on the reasonable inferences that the *employee* could draw from the statements or conduct of the employer." *Pennypower Shopping News, Inc. v. NLRB*, 726 F.2d 626, 629 (10th Cir.1984) (emphasis in original); *accord NLRB v. Downslope Indus.,*

*Inc.*, 676 F.2d 1114, 1118 (6th Cir.1982); *NLRB v. Ridgeway Trucking Co.*, 622 F.2d 1222, 1224 (5th Cir.1980) (per curiam); *NLRB v. Trumbull Asphalt Co.*, 327 F.2d 841, 843 (8th Cir.1964). In *Health Enterprises of America, Inc.*, 273 NLRB, 1196 (1984), the Board held that a top management official could be taken at his word when he told an employee that he was fired. *Id.* at 1204. In *Trident Recycling Corp.*, 282 NLRB 1255 (1987), the Board stated that it must view the evidence through the strikers' eyes. *Id.* at 1260. "Each case requires an examination of the facts." *Id.*

Simovich's statements that Baugh and Naranjo were "fired" and "might as well go home" would lead reasonable workers to believe they had been discharged. As a high management official, Simovich had the power to discharge employees; the employees were entitled to take Simovich at his word. *Health Enters. of Am., Inc.*, 273 NLRB at 1204. Simovich backed up these statements by threatening to have Baugh and Naranjo arrested if they did not leave. Champ has made no showing that the ALJ's credibility determinations were erroneous. *See Lippincott*, 661 F.2d at 114 (deference must be given to a ALJ's credibility determinations absent a clear preponderance of the evidence to the contrary).

The fact that Baugh and Naranjo continued picketing and that Champ subsequently reinstated them after the Union agreed to terminate the strike does not alter our conclusion that it was reasonable for them to believe that they were discharged on October 17, 1979. It is not unusual for an

---

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;....

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...

29 U.S.C. § 158(a)(1), (3) (1988).

**2.** The letter reads as follows:

We have been waiting patiently for you to return to your job and we shall continue to do so until Friday morning, November 2, at 8 a.m.

If you choose to keep your job, drive in the gate where the guards are just south of the

company's main office and go to the personnel office—you will be put to work immediately.

*There is plenty of work and CHAMP will continue to operate!*

If you choose not to return to your job, you may *Lose Your Job Entirely!* The company is not continuing the health and life insurance of persons not working—if you want to keep your health and life insurance protection for you and your family, you may do so by calling (213)444-9561 for instructions.

We do hope that you will give very careful consideration to this opportunity and to your future, and return to work now!

employee who has been unlawfully discharged for union activity to continue to picket. In *Health Enterprises of America, Inc.*, 273 NLRB 1196 (1984), the Board concluded that a discharged employee's continued picketing did not alter the fact of his discharge. *Id.* at 1203–04. The fact that Baugh and Naranjo presented themselves for reinstatement does not demonstrate it was unreasonable for them to believe that on October 17, 1979 they had been discharged. *See Pennypower Shopping News*, 726 F.2d at 630 (holding that subsequent reinstatement did not alter a finding of discharge where that employer had created ambiguity as to its employees' status); *Central Broadcast Co.*, 280 NLRB 501, 504 (1986) (holding that a subsequent reinstatement did not alter the fact that a discharge took place).

B. *The Discharge of Valenzuela, Solis, Gutierrez, and Ortiz*

■ On October 25, 1979, Champ's negotiator, Edmund Hoy, Jr., met with Ralph Gazzigli, the Union's negotiator. Hoy handed Gazzigli a list, prepared by Tom Simovich, containing the names of Steve Baugh, Heriberto Valenzuela, Joe Solis, Ruben Gutierrez, and Eduardo Ortiz. Hoy informed Gazzigli "very adamantly" that the individuals on the list "would never be rehired, or reinstated under any conditions." Gazzigli informed Hoy that he could not negotiate away any employee's job and handed the list back to Champ's negotiator. Gazzigli testified that he told Hoy "there was no way I could negotiate, or agree to single out any persons as far as negotiating the job away ... I couldn't do that, I wouldn't do it." Prior to giving back the list, Gazzigli read all of the names on the list.

At a subsequent negotiating session, on October 31, 1979, Hoy again attempted to present the list to Gazzigli. Tom Simovich, Steve Baugh, and a federal mediator were also present. Hoy stated that he wanted to present the list containing the names of individuals who would not be rehired under any circumstances, regardless of whether a contract was formed. Gazzigli again informed Hoy that he would not negotiate

anyone's job away. He cautioned Hoy against formally presenting the list. The mediator intervened. The list was never formally presented at the negotiating session. Baugh saw his name on the list when it was placed on the table by Hoy.

The Board concluded that each of the employees named in the list had been discharged by Champ. The Board determined that the employment status of these individuals had been removed by Champ as a negotiable matter, thereby "effectively implementing their discharges." The Board further stated that "Hoy's characterization of the employment tenure of the employees on the list was clear and unambiguous: they would 'never' resume their employment 'under any conditions.' "

Champ argues that the employees on the list were not discharged. First, Champ claims that "there is no credible evidence" that the employees knew their names were on the list. Second, Champ contends that the list was presented as a negotiable matter, not as "a firm and final decision."

As discussed above, the test for determining if Valenzuela, Solis, Gutierrez, and Ortiz were discharged is whether a reasonable employee would have believed he was terminated by the employer's conduct. *NLRB v. Cement Masons Local No. 555*, 225 F.2d at 172. An employee must be aware of the employer's actions, otherwise he would have no basis for inferring his employment had been terminated. *See Health Enters. of Am., Inc.*, 273 NLRB 1196, 1204 (1984) (finding no discharge where neither employees nor union was aware that employer had stamped "terminated" on timecards).

The record shows that Gazzigli, the Union negotiator, saw all of the names on the list. Baugh also saw Joe Solis' name on the list. On November 5, 1979, at a Union meeting, Baugh and Gazzigli discussed the no reinstatement list with all the Union members. The evidence shows that the discharge issue dominated all of the discussion at the proceedings at the Union meeting. Accordingly, substantial evidence exists to demonstrate that the striking em-

ployees were aware of Champ's actions. *See Martin Arsham Sewing Co.*, 244 NLRB 918, 918 (1979) (Board held discharge had occurred where union officials were aware of company's conduct and communicated that information to the employees).

We hold that Champ's conduct in showing the list to Union officials and stating unequivocally that the listed employees would never be reinstated regardless of whether a contract was reached, was substantial evidence demonstrating that the named employees reasonably believed they had been discharged. Champ's argument that the list was merely a negotiable matter is belied by the evidence that Hoy "adamantly" stated that the listed individuals would not be reinstated under any conditions, regardless of whether a contract was reached.

## II

### CONVERSION OF THE STRIKE

■ Having determined that Champ discharged employees engaged in an economic strike, we must next review the evidence to determine whether this conduct converted the economic work stoppage into an unfair labor practice strike. It is undisputed that the discharge of a striking employee is an unfair labor practice under sections 8(a)(1) and (3) of the Act. *See NLRB v. Kaiser Steel Corp.*, 700 F.2d 575, 576–77 (9th Cir. 1983) (discharge of employees for striking is an unfair labor practice).

■ Champ contends that "even if one or both of the findings of illegal discharges is upheld, the record is devoid of evidence which supports a finding of the strike being converted." Brief for Respondent at 5–6. Champ also argues that "[t]he burden is on the General Counsel to prove that the unfair labor practices aggravated or prolonged the strike." *Id.* at 6. We agree with Champ that the burden is on the General Counsel to prove that the unfair labor practices aggravated or prolonged the strike. In *N.L.R.B. v. Top Manufacturing Co., Inc.*, 594 F.2d 223 (9th Cir. 1979), we were called upon to determine

whether an economic strike had been converted into an unfair labor practice strike. *Id.* at 225. We began our discussion of the applicable law by stating "the controlling legal principles are not controverted." *Id.* Unfortunately, we cited no authority for this proposition. Instead we described the "controlling legal principles" in the following words: "A strike begun in support of economic objectives becomes an unfair labor practice strike when the strike is expanded to include a protest over unfair labor practices." *Id.* By using this language to reflect "controlling legal principles," we did not intend to adopt a new rule. To make clear what is implicit in our decision in *Top*, we agree with those circuits that have adopted the principle that violations of the National Labor Relations Act which aggravate or prolong an economic strike will convert it to an unfair labor practice strike. *See Soule Glass And Glazing Co. v. N.L.R.B.*, 652 F.2d 1055, 1080 (1st Cir.1981) (finding no conversion where the unfair labor practice did not prolong the strike or result in a delayed settlement); *See also C–Line Express*, 292 N.L.R.B. No. 63 (1989) (finding no conversion where the unfair labor practice did not cause a prolongation of the work stoppage); *Vulcan Hart Corp. (St. Louis Div.) v. N.L.R.B.*, 718 F.2d 269 (8th Cir.1983) (finding conversion where the unfair labor practice prolonged the strike); *Facet Enterprises, Inc., v. N.L.R.B.*, 907 F.2d 963, 977 (10th Cir.1990) (applying the prolong or aggravate test and finding conversion where a strike was expanded to include a protest over unfair labor practices).

■ Champ's notification to the Union's principal negotiator that certain striking employees, including a member of the employees' negotiating committee, would never be rehired or reinstated "under any conditions" expanded the existing economic dispute between the parties to include the employment status of striking employees and delayed settlement of the strike. Champ knew or should have known that this direct challenge to union solidarity and collective action would cause the membership to take action to protest this unfair

labor practice. The unanimous vote of the membership on November 5, 1979 to remain on strike until all strikers were reinstated should have been foreseeable to any rational employer.

Champ argues that, in determining whether there is substantial evidence to support a finding that the economic work stoppage became an unfair labor practice strike, we should consider the fact that the picket signs made no reference to the discharge of striking employees. Champ cites *NLRB v. Proler International Corp.*, 635 F.2d 351 (5th Cir.1981), as authority for this proposition. In *Proler* the court held that the evidence was insufficient to show that an economic work stoppage was converted to an unfair labor practice strike where the record showed that a company vice-president told employees that if they did not return to work they would lose their jobs. *Id.* at 353. The Fifth Circuit concluded that "[t]he employees did not consider themselves discharged" or threatened with job termination. *Id.* at 354. The court also noted that the picket signs did not list the threat of discharge or discharge as a grievance. *Id.* In the instant matter, as discussed above, substantial evidence supports a finding that the union membership reasonably inferred that striking employees had been illegally discharged.

■ In *Vulcan Hart*, the employer made a similar argument concerning failure to change the picket signs. 718 F.2d at 276. Petitioner asserted that "the Union's strike remained an economic strike after November 1, because the subject matter on the picket signs remained the same, and the strikers affirmed that they would not return until the Union and V–H agreed on a contract." *Id.* The Court rejected this argument *sub silentio* and found that there was substantial evidence that the employer engaged in unfair labor practices by withdrawing recognition of the union after the workers went on strike. *Id.* We conclude, from the authorities cited by Champ, that the failure to change the wording on the picket signs to show that the employer is guilty of unfair labor practices is a factor that should be considered in reviewing the record as a whole to determine whether an unfair labor practice has converted an economic work stoppage into an unfair labor practice strike. We have considered this factor. We remain persuaded that substantial evidence supports the Board's finding.

■ Champ also appears to argue that the economic work stoppage was not converted into an unfair labor practice strike as a result of the discharge of the striking employees because "there is no evidence that it became an issue in the negotiations," Brief for Respondent at 10, or that the membership's grievance was communicated to Champ. *Id.* No authority is cited for the suggestion that a union must inform an employer that his unfair labor practices have converted the work stoppage into an unfair labor practice strike. The record shows that Champ gratuitously presented the issue of the company's refusal to rehire the discharged employees to the Union's negotiator and informed him that rehiring would not be considered under any circumstances. The impact in the pending negotiations should have been obvious to any reasonable employer. Any union's credibility with its membership would be destroyed if it condoned the discharge of a union member, who was acting as a member of the negotiating committee during an economic strike, without prolonging the strike until this grievance was resolved. No notice was required that prolongation of the strike would naturally flow from the employer's grievous unfair labor practices. Furthermore, the record shows that the Union's negotiator informed Champ's representative that the Union could not agree to deny reinstatement to any person.

### III

### ALLEGED BOARD CONSIDERATION OF ALLEGATIONS OUTSIDE THE COMPLAINT

Champ claims that the Board "improperly considered allegations outside the complaint in finding a conversion of the strike to an unfair labor practice strike." Brief

for Respondent at 13. The complaint alleged that the discharges described above caused the strike to be converted; it did not allege that Champ's other alleged unfair labor practices converted the economic work stoppage into an unfair labor practice strike. Champ bases its argument on the fact that the ALJ relied in part upon unfair labor practices other than the discharges. Champ contends that the Board failed to modify the ALJ's order and that, therefore, "it must be assumed that the Board also relied on the 'other alleged acts'." Brief for Respondent at 15.

The record does not support Champ's contention that the Board considered unfair labor practices not alleged in the complaint. We must determine whether the *Board*, not the ALJ, properly applied the law. *Lippincott*, 661 F.2d at 115. Thus, the fact that the ALJ may have improperly relied upon allegations outside the complaint is irrelevant if the Board did not do so. Our examination of the Board's decision reveals that it properly confined its review of the conversion issue to the discharge of the employees. The Board specifically stated "that the termination of each of the six employees served to convert the strike to an unfair labor practice strike." The Board made no mention of any other alleged unfair labor practices when it determined that the strike was converted. In fact, the Board determined that the strike was converted at the November 5, 1979 Union meeting at which the discharges were discussed. We find that the Board properly confined its review to the allegations raised in the complaint. Therefore, Champ's contention that the Board improperly considered acts not alleged in the complaint is without merit.

## IV

### ALLEGED SUPPRESSION OF RELEVANT EVIDENCE

Champ argues that it was erroneously foreclosed from producing evidence that would demonstrate that the alleged discharge of the striking employees had no effect on prolonging the strike. The record

shows that the ALJ informed Champ's counsel as follows:

I am not going to preclude you; I can see the relevance if you want to argue that [the strike was not prolonged because of what management did], but I am going to consider the door opened [to evidence of surface bargaining] in all fairness to you, if you do pursue that area.

In response to the court's explanation of the ruling allowing Champ's counsel to proceed with questions that would attempt to show that management's conduct did not prolong the strike, Champ's counsel stated: "Okay. Based on what you advised me, I am not going to pursue that line of questioning." Thus, contrary to Champ's assertion, the ALJ ruled that the proffered evidence was relevant and admissible.

## V

### THE STRIKERS' RIGHT TO IMMEDIATE REINSTATEMENT

On April 17, 1980 the Union determined that the strike was ineffective and decided to end the strike and pursue its unfair labor practice claims. On that date the Union sent a telegram to Champ making an unconditional offer to return to work on April 21. On April 21, approximately 54 of the striking employees showed up at their regular shift to begin work. Champ, however, did not put them to work on that day. The reinstatement of the strikers did not actually begin until May 9, 1980. On that date, Champ gradually began reinstating some of the strikers. Most of the strikers had been reinstated by May 30. The remainder were not reinstated for an extended period of time.

When the striking employees arrived for work on April 21 Champ gave each of them a letter which stated: "Your union has not given us reasonable time to replace you to your job or an equivalent job. We do not have sufficient health and sanitation facilities to accept any major number of employees. For further instruction, please contact your union." Several employees also testified that Ed Simovich told them he did

not have timecards ready for their return. Simovich testified that he had three concerns that caused him to delay reinstatement. First, he was concerned with potential violence between the strikers and nonstrikers given the number of threatening confrontations and vandalism incidents that had occurred during the strike. Second, he wanted to ensure the quality of his product and was concerned about the potential for sabotage of the equipment. Finally, he cited worsening economic conditions and a desire to ensure "continuity in work in the jobs being performed."

■ The Board upheld the ALJ's conclusion that Champ violated sections 8(a)(1) and (3) of the Act by failing to reinstate the strikers who had not been permanently replaced before the strike was converted into an unfair labor practice strike. The ALJ found that Champ's evidence that it delayed reinstatement to avoid violence between the strikers and nonstrikers was not credible. Champ did not produce evidence to show that the strikers' immediate reinstatement would have created a safety hazard. The ALJ also concluded that testimony produced by Champ, that it was concerned about quality control and economic conditions, was pretextual and unworthy of consideration. The ALJ's conclusion that the only credible reason that Champ delayed reinstatement was because the strikers "engaged in protected concerted activity" is supported by substantial evidence in the record when viewed in its entirety.

Champ argues that it was justified in delaying reinstatement because of its concern for violence among the workers. The ALJ found Champ substantially added to the hostility by discharging striking employees, failing to take action against nonstrikers for their misconduct, and "clearly exhibiting anti-union animus." Champ relies on *Pacific Powder Co.*, 84 NLRB 280 (1949), in support of its contention that potential violence justified a delay in reinstatement. In *Pacific Powder*, the employer attempted to justify its refusal to reinstate striking employees immediately on the basis of hostility between strikers and nonstrikers. This argument was rejected because the employer substantially added to the hostility that existed between the nonstrikers and strikers. *Id.* at 290–24. Thus, Champ cites no case, nor has our research revealed any relevant authority, in which an employer's refusal to reinstate unfair labor practice strikers immediately was upheld on the basis of worker hostility.

■ Unfair labor practice strikers are entitled to immediate reinstatement upon making an unconditional offer to return. *NLRB v. International Van Lines*, 409 U.S. 48, 50–51, 93 S.Ct. 74, 76–77, 34 L.Ed.2d 201 (1972); *NLRB v. Top Mfg. Co.*, 594 F.2d 223, 225 (9th Cir.1979). Although economic strikers may be permanently replaced, an employer must dismiss replacement workers if necessary to make room for the returning unfair labor practice strikers. *International Van Lines*, 409 U.S. at 50–51, 93 S.Ct. at 76–77; *NLRB v. West Coast Casket Co.*, 205 F.2d 902, 908 (9th Cir.1953). "When the striking employees ma[ke] an unconditional offer to return to their employment, [the employer] [i]s obligated to make them an unconditional offer of reinstatement." *Presto Casting Co. v. NLRB*, 708 F.2d 495, 499 (9th Cir.), *cert. denied*, 464 U.S. 994, 104 S.Ct. 489, 78 L.Ed.2d 684 (1983).

Substantial evidence justifies the Board's finding that Champ improperly failed to offer immediate reinstatement to the unfair labor practice strikers. Although it is true, as Champ alleges, that the strike was rife with acts of aggression, violence, and property damage, Champ's behavior significantly contributed to the atmosphere of hostility. The record shows that Champ committed unfair labor practices by discharging economic strikers and failed to take any action against nonstriking employees for their acts of violence against strikers. Champ has failed to demonstrate that it was justified in delaying reinstatement because of a concern for potential employee violence.

## VI

## DISCHARGE OF PERMANENTLY REPLACED STRIKERS

Prior to November 5, 1979, the date on which the strike became an unfair labor

practice strike, Champ had permanently replaced ten of the economic strikers.[3] As noted earlier, Champ was entitled to replace the economic strikers permanently. *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1153 (9th Cir.1986). On May 30, 1980 Champ called the ten replaced strikers into the personnel office. Champ gave each employee a letter which told the employees that they were on layoff status because no jobs were available. The letter continued, "we will place your name on a preferential hiring list at your request, which must be received by the company, in writing, no later than June 6, 1980." When asked by an employee whether signing the request forms would result in a loss of seniority, Ed Simovich said that he could not answer at that time. None of the employees returned the form.

On June 10, 1980, Champ sent the ten employees another letter, along with their accrued vacation pay. The letter stated:

As of this date, we have not received your request to place your name on the company's preferential hiring list. We discussed this matter with you on May 30, 1980, and gave you a preferential hiring form with a stamped and pre-addressed envelope for mailing directly to the company. We desire to know whether or not you desire to be included on the preferential hiring list so that we do not overlook you should we need additional help in the future. If you desire to be included on the preferential hiring list, we must have your request within the next several days or so, unless there is an extenuating circumstance beyond your reasonable control.

■ Subsequently, after receiving no reply to its letter, Champ mailed another letter to the six employees who had vested interests in the profit sharing plan returning all of their money. When the Union inquired of Champ as to the status of these employees, Champ stated in a letter that checks were sent as a result of the employer's termination of employment.

After the Union notified Champ that, in its view, Champ had discharged the employees, Champ sent a letter on September 5, 1980 requesting a return of the profit sharing checks. All but one employee returned these checks. Under the Act, permanently replaced economic strikers continue to be employees until they obtain substantially equivalent employment; Champ could not simply discharge them because there were no available jobs at the time. *NLRB v. Rockwood & Co.*, 834 F.2d 837, 389 (9th Cir.1987).

The Board found that Champ's actions effectively discharged the employees in violation of sections 8(a)(1) and (3) of the Act. The Board did not determine what remedy should be granted under the circumstances, in light of Champ's September 5 letter, leaving that to the compliance stage. Champ argues that it did not discharge the ten employees. Champ contends that the only reason for remitting the profit sharing checks was because the trustee of the profit sharing plan told Champ that only active employees could participate. Thus, Champ alleges that its actions "did not emanate from any intention to terminate ... these employees." Brief for Respondent at 36.

■ Although economic strikers may be permanently replaced, they are entitled to reinstatement when and if a job opens up for which the striker is qualified. *NLRB v. Fleetwood Trailor Co.*, 389 U.S. 375, 381, 88 S.Ct. 543, 547, 19 L.Ed.2d 614 (1967); *NLRB v. Rockwood & Co.*, 834 F.2d 837, 839 (9th Cir.1987). Once the employee makes an unconditional offer to return to work, the employer must make an unconditional offer of reinstatement, if a job is available. "The only obligation placed upon the striker is that he unconditionally request reinstatement." *NLRB v. McQuaide, Inc.*, 617 F.2d 349, 354 (3d Cir. 1980). The reinstatement cannot be made conditional on signing a form. *Presto Casting Co. v. NLRB*, 708 F.2d at 498–99. "The Company ha[s] no right to require the employees to repeat the statement of inter-

---

**3.** The ten strikers are Antonio Andrade, Javier Arroyo, Alejandro Arroyo, David Coronado, Rick Craft, Enrique Figueroa, Lorenzo Franco, Micky Lambright, Martiniano Rodriguez, and Francisco Zamora.

est [in returning to work] made by the Union." *NLRB v. McQuaide, Inc.*, 617 F.2d at 354; *see also NLRB v. Vitronic Div. of Penn Corp.*, 630 F.2d 561, 564–65 (8th Cir.1979) (company could not require affirmative action on employee's part to remain on the reinstatement list; this included filling out a form).

As stated above in Part I, the test for whether a discharge has occurred is whether the words or conduct would lead a reasonable employee to believe that he or she had been discharged. *See Cement Masons Local No. 555*, 225 F.2d at 172. This test does not depend upon the employer's intentions, but on the reasonable employee's reaction to the employer's action.

■ Under the facts found credible by the ALJ, substantial evidence supports the Board's finding of a discharge. Champ improperly required the employees to sign forms indicating their desire to be placed on the preferential hiring list. Although Simovich stated that this was not truly a requirement, this information was never conveyed to the employees. Later, after refusing to respond to Champ's letters, the employees received their accumulated vacation pay and profit sharing benefits. Based upon inquiry from the Union, Champ stated that the employees had been terminated. Upon these facts, a reasonable employee could believe he or she had been discharged.

## VII

## CHAMP'S REFUSAL TO REINSTATE STRIKERS FOR ALLEGED MISCONDUCT

Champ argues that it properly refused to reinstate unfair labor practice strikers, Jose Villavicencio, Carlos Almoroz, Joe Solis, and Ramon Rodriguez, for strike-related misconduct.

After the strikers unconditionally offered to return to work, Champ refused to reinstate eleven of the unfair labor practice strikers, including the four mentioned above, for alleged strike misconduct. Between May 5 and May 7, 1980 Champ obtained a list of strikers with pending criminal charges from the police department. The list contained the names of the 11 discharged strikers. On May 30, 1980 Champ requested that the persons on the list report to the personnel office. Champ gave each employee a letter stating "You currently have pending criminal charges with the District Attorney's Office for STRIKE–RELATED CRIMINAL VIOLATIONS. You are therefore, ineligible for work reinstatement. Should your arrest(s) be considered false, your reinstatement will be reconsidered at that time." Ed Simovich instructed the strikers that they clear up their records before they could be reinstated. At this time, Champ made no mention of any strike-related misconduct other than that which resulted in criminal charges. In fact, Champ failed to mention any other misconduct until the hearing before the ALJ.

On June 6, 1980, Champ sent another letter to the group indicating that they were on indefinite suspension status. The letter stated "[w]e are looking deeply into your pending criminal charges which resulted from your arrest(s) for strike-related violence." On October 31, 1980 Champ sent a final letter to Villavicencio, Almoroz, and Rodriguez stating that they had been terminated for "strike-related criminal violence." The letter made no mention of any misconduct other than the pending criminal charges.

Based upon these facts, the ALJ concluded that Champ improperly refused to reinstate the strikers. The ALJ provided several reasons for this holding. The ALJ found that the only reason provided by Champ up until the time of the hearing for refusing to reinstate the employees was that criminal charges were pending against them. Champ had not relied upon any of the other alleged acts of misconduct. The ALJ concluded that Champ's delay in bringing up conduct unrelated to the pending criminal charges demonstrated Champ's lack of good faith in discharging the strikers. In addition, the ALJ found that Champ condoned the misconduct and engaged in discriminatory practices by failing to take action against nonstriking employ-

ees for their misconduct, and by offering to reinstate the strikers on October 30, thereby condoning all acts prior to that date. Finally, the ALJ credited the strikers' testimony that they did not engage in serious misconduct after October 30, 1979, and also determined that the strikers did not commit the acts of misconduct that resulted in arrests. The ALJ expressly found that the testimony of Champ's witnesses was not credible. The ALJ also determined that Champ displayed anti-union animus in its actions.

The Board upheld the ALJ's conclusion that Champ violated sections 8(a)(1) and (3) of the Act by refusing to reinstate the strikers. The Board found that the only grounds for denying reinstatement were the pending criminal charges. The Board noted that Champ failed to mention any other reason for denying reinstatement until the hearing before the ALJ. The Board also found that none of the employees were guilty of the misconduct described in the criminal charges.

■■■■ "Striking employees who engage in serious picket line misconduct forfeit the protection of the Act and may be discharged for such conduct." *General Teamsters Local No. 162 v. NLRB*, 782 F.2d 839, 841 (9th Cir.1986). Once the General Counsel has made a prima facie showing of violation of the Act by demonstrating that an employee was discharged for conduct occurring during a strike, "[t]he employer may defend the discharge on the ground that it had 'an honest belief that the employee disciplined was guilty of strike misconduct of a serious nature' *and* that the discharge decision was based on that misconduct." *Id.* (quoting *General Tel. Co. of Mich.*, 251 NLRB 737, 738 (1980) (emphasis added), *enforced*, 672 F.2d 894 (D.C.Cir.1981)). Once an employer makes this showing, "the General Counsel must then affirmatively show that the employee did not in fact engage in such conduct." *General Teamsters*, 782 F.2d at 841–42; *accord General Tel. Co. of Mich.*, 251 NLRB at 738–39. If it is found that the employee did not engage in the conduct, he cannot be discharged regardless of the em-

ployer's good faith belief. *NLRB v. Burnup and Sims, Inc.*, 379 U.S. 21, 23, 85 S.Ct. 171, 172, 13 L.Ed.2d 1 (1964).

■■■ Substantial evidence supports the Board's determination that Champ did not act in good faith in refusing to reinstate the strikers. The fact that Champ never mentioned any misconduct other than the pending criminal charges up until the time of the hearing supports the Board's finding that Champ only relied on the pending criminal charges when it discharged the strikers. The Board's decision is also supported by the fact that Champ only refused to reinstate employees with pending criminal charges, and did not look into misconduct by any other employee.

Substantial evidence supports the Board's decision that none of the conduct underlying the pending criminal charges in fact occurred. The ALJ credited the testimony of Villavicencio, Almaroz, Solis, and Rodriguez that they did not engage in the misconduct that resulted in criminal charges. The ALJ did not believe the testimony of Champ's witnesses concerning these incidents. All of the criminal charges were dropped with the exception of those against Villavicencio, who pleaded *nolo contendere* to blocking a vehicular crossing. Champ has not shown by a clear preponderance of the evidence that the ALJ's credibility determinations should be rejected. *Lippincott Indus., Inc.*, 661 F.2d at 114. Because the General Counsel has demonstrated that the misconduct in question did not in fact occur, Champ's refusal to reinstate these employees constitutes an unfair labor practice. *See Burnup & Sims*, 379 U.S. at 23, 85 S.Ct. at 172 (an employer may not discharge an employee for misconduct that did not occur even if the employer had a good faith belief that such misconduct occurred). Because we conclude that the discharge of the employees was based on the existence of criminal charges that were not proved, we need not address the Union's argument that Champ condoned the strikers' misconduct or subjected them to disparate treatment.

## VIII

### CONCLUSION

The Board's order is supported by substantial evidence and we therefore grant enforcement.

ENFORCEMENT GRANTED.