SKS DIE CASTING & MACHINING, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

SKS DIE CASTING & MACHINING, INC., Respondent.

Nos. 89–70324, 91–70377.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 12, 1990.

Decided Aug. 13, 1991.

Michael W. O'Neil, Orinda, Cal., for petitioner-cross-respondent.

David A. Fleischer, N.L.R.B., Washington, D.C., for respondent-cross-petitioner.

Before GOODWIN, ALDISERT * and KOZINSKI, Circuit Judges.

GOODWIN, Circuit Judge:

This petition for review and cross-application for enforcement arises out of a controversy between SKS Die Casting & Machining, Inc. and Bay Area District Lodge No. 115, International Association of Machinists and Aerospace Workers, AFL–CIO ("the Union"), the union representing SKS' employees. The controversy arose after SKS encountered financial difficulties and sought to renegotiate its existing contract with the Union. SKS proposed a two-tiered wage structure, in which existing employees would receive wages at or near their existing rates, but new production employees would receive wages approximately half those of existing production employees. The Union opposed SKS' two-tiered wage proposal. After several weeks' discussion between the parties, SKS informed the Union that it had filed for bankruptcy and had asked the bankruptcy court for permission to reject the existing collective bargaining agreement. The bankruptcy court initially refused to permit such rejection, but after negotiations between the parties for approximately a month produced no result, the bankruptcy court permitted SKS to reject the collective bargaining agreement. In response to the company's rejection of the collective bargaining agreement, the Union began a strike on May 5, 1986.[1]

The events which are the primary focus of this appeal occurred between May 5 and May 13. On May 5, SKS president Jerome Keating posted on the company's front door a list of the wages he was willing to pay each striking employee. The document listed wages only for workers who had been employed at the time the strike began, and it therefore made no mention of SKS' proposed lower wage rate for newly hired workers or workers who might be recalled from lay-off. Many of the picketing strikers expressed a willingness to return to work at the posted rates, and they asked their union representative to confirm that Keating was willing to pay those wages. Keating then appeared on the picket line and confirmed his willingness to do so. The pickets reiterated their willingness to return to work for those wage rates.

On May 9, Union representative Daniel Borrero sent the following letter to Keating:

> The information that I received from you is that you are willing to pay the wages you have posted on the front door of S.K.S. Also, you stated that you are willing to negotiate with the Union.
>
> The Union is willing to negotiate immediately and have our members return to work under the posted wages, while we continue to negotiate a new Contract. I am available at your convenience.

On May 11, Keating wrote back, stating that the company was not interested in meeting for negotiations "at this time." In response to Keating's letter, the Union filed a charge with the National Labor Relations Board alleging that SKS had committed various violations of the National Labor Relations Act, 29 U.S.C. §§ 151–169 (1988), (hereinafter "NLRA" or "the Act"). The Regional Director of the National Labor Relations Board then filed a complaint against SKS. The Administrative Law Judge (ALJ) issued a decision in which it found that SKS had committed some, but

---

* Honorable Ruggero J. Aldisert, Senior United States Judge for the Third Circuit, sitting by designation.

1. All dates are in 1986 unless otherwise specified.

not all, of the alleged unfair labor practices. Both parties appealed to the NLRB.

On March 16, 1987, prior to resolution of that appeal, the strikers made a second offer to return to work. The parties agree that this offer was unconditional. SKS responded by stating that it would afford the strikers "all of the legal rights to which they are entitled as economic strikers." Because of SKS' response, the Board's Regional Director filed an additional complaint alleging that SKS had violated the NLRA by refusing to reinstate unfair labor practice strikers following their unconditional offer to return on March 16, 1987. The Board consolidated this second complaint with the pending appeal.

The Board found that SKS had committed unfair labor practices and imposed reinstatement and back-pay remedies. We enforce the order in part, reverse in part, and remand.

## I. *General Standard of Review*

This court must uphold a decision of the NLRB "if its factual findings are supported by substantial evidence and if it has correctly applied the law." *NLRB v. Champ Corp.*, 913 F.2d 639 (9th Cir.1990); *see also* 29 U.S.C. § 160(e) (1988) (NLRB findings of fact shall be conclusive "if supported by substantial evidence on the record considered as a whole."). This court determines whether NLRB findings are supported by substantial evidence based on a review of all the evidence in the record, including both the evidence that supports and the evidence that detracts from the findings. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–88, 71 S.Ct. 456, 463–65, 95 L.Ed. 456 (1951); *NLRB v. Tomco Communications, Inc.*, 567 F.2d 871, 876–77 (9th Cir.1978). A reviewing court may not "displace the [NLRB]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo." *Universal Camera*, 340 U.S. at 488, 71 S.Ct. at 465.

## II. *Unconditional Offer to Return to Work*

■ An employer is required to reinstate economic strikers who make an unconditional offer to return to work, provided the employer does not have legitimate and substantial business justification for the refusal to reinstate the strikers. *Mid–County Transit Mix, Inc.*, 264 NLRB 782, 789 (1982). The ALJ held that SKS did not violate this rule. The holding was based on the ALJ's finding that the Union's May 9 offer to return to work was conditioned on SKS abandoning its two-tiered wage proposal and agreeing to pay all Union "members" the posted wages, including any nonstriking members on lay off who might some day be rehired. The Board reversed.

■ The substantial evidence standard of review applies to our review of the Board's finding that the Union's May 9 letter was an unconditional offer to return to work. Resolving how the parties understood the words of the offer requires an understanding of the factual context in which the offer was made. To the extent that the question involves drawing inferences from undisputed facts, it is similar to other questions involving inferences in which this court has applied the substantial evidence standard of review. *See, e.g., Brooks Cameras, Inc.*, 691 F.2d at 915, 919 (applying the substantial evidence standard to the question of an employer's motive behind an employee discharge, where the Board's findings in part relied on drawing inferences from underlying facts).

■ Where the Board has reversed an ALJ's finding of fact, as it did on the question whether the return to work offer was unconditional, this court still applies the substantial evidence standard of review to the findings of the Board, not to the findings of the ALJ. The ALJ's contrary findings are one factor that we consider in evaluating whether the Board's findings are supported by substantial evidence. *See NLRB v. Brooks Cameras, Inc.*, 691 F.2d 912, 915 (9th Cir.1982); *see also Universal Camera Corp.*, 340 U.S. at 496, 71 S.Ct. at 468 (although the substantial evidence standard is not modified when the Board

reverses the ALJ, the "evidence supporting a conclusion may be less substantial" when the Board has reversed the examiner who observed the witnesses); *Tomco Communications, Inc.,* 567 F.2d at 877 (taking into consideration, in determining substantiality of evidence, that the Board diverged from the ALJ's findings on matters of credibility).

■ The significance of the ALJ's report "depends largely on the importance of credibility in the particular case." *Universal Camera,* 340 U.S. at 496, 71 S.Ct. at 469. In contrast, on matters involving inferences from facts rather than determinations of credibility, this court defers to the Board, without giving special weight to the ALJ. *See Brooks Cameras, Inc.* at 915 ("As to derivative inferences, our deference is to the Board and not the administrative law judge. 'Board members are presumed to have broad experience and expertise in labor-management relations. Further, it is the Board to which Congress has delegated administration of the Act. The Board, therefore, is viewed as particularly capable of drawing inferences from the facts of a labor dispute.' ") (quoting *Penasquitos Village, Inc. v. NLRB,* 565 F.2d 1074, 1079 (9th Cir.1977)).

■ We note at the outset that this issue does not turn primarily on resolving a credibility dispute, which would lend greater weight to the ALJ's findings. Rather, the dispute primarily involves inferences drawn from essentially undisputed underlying facts, where our deference is to the Board.

The controversy over whether the Union made an unconditional offer to return to work centers on inferences drawn from the use of the word "members" in Borrero's May 9 letter. SKS asserts that this term represented a Union demand that SKS abandon its proposal for two-tiered wage rates and pay the posted rate to all Union members, including any members on layoff who might be recalled at a future time.

The Board found that the letter's reference to "members" included only the Union strikers. Accordingly, the Union's May 9 offer to have the *strikers* return to work at

the posted rates mirrored SKS's offer to take back the strikers and was therefore unconditional. Alternatively, the Board found that even if "members" as used in the May 9 letter was ambiguous, the risk was with SKS to clarify the ambiguity.

These findings by the Board are supported by substantial evidence. Keating himself never testified that he thought the term "members" definitely meant all Union members. Instead, he testified that he found the term to be confusing, and at one point even testified that he knew "members" meant only the striking workers. But if an offer to return could be considered ambiguous, the employer has a duty to seek clarification. Having failed to do so, SKS "may not be heard to complain if such uncertainty is resolved against its interests." *Home Insulation Serv.,* 255 NLRB 311, 312, enf'd *without op.,* 665 F.2d 352 (5th Cir.1981).

Moreover, in the May 9 letter containing the offer to return, the Union also expressed a desire to negotiate. This weighs against SKS's interpretation of the letter as requiring SKS to abandon its two-tier wage proposal.

SKS also relies on Union representative Borrero's testimony that he intended "members" to include laid-off employees. However, there is no evidence that SKS knew of Borrero's intent. We will not conclude that an offer was conditional based on an intent not conveyed to the employer. *See Teamsters Local 115 v. NLRB,* 640 F.2d 392, 395 (D.C.Cir.), *cert. denied,* 454 U.S. 827, 102 S.Ct. 119, 70 L.Ed.2d 102 and 454 U.S. 837, 102 S.Ct. 141, 70 L.Ed.2d 118 (1981).

The burden rests on an employer to prove that an offer to return to work is conditional. *See Soule Glass and Glazing Co. v. NLRB,* 652 F.2d 1055, 1107 (1st Cir.1981). The Board's decision that SKS failed to meet that burden here is supported by substantial evidence.

III. *Effect of Unconditional Offer to Return*

■ Once the strikers made an unconditional offer to return, the employer's duty

to reinstate them depended on whether they were economic or unfair labor practice strikers. If they were economic strikers, SKS was required to reinstate them only if they had not been permanently replaced. *NLRB v. MacKay Radio & Telegraph Co.*, 304 U.S. 333, 346–47, 58 S.Ct. 904, 911, 82 L.Ed. 1381 (1938). If they were unfair labor practice strikers, SKS was required to reinstate them, even if they had been permanently replaced. *Mastro Plastics Corp. v. NLRB*, 350 U.S. 270, 278, 76 S.Ct. 349, 355, 100 L.Ed. 309 (1956).

The Board found that at the time of the May 9 unconditional offer, the strikers were economic strikers and were thus entitled to reinstatement to the extent that they had not been permanently replaced. The Board further found that none of the strikers had been permanently replaced at the time of the May 9 offer to return, and that therefore they were all entitled to reinstatement and back pay dating from May 9, 1986. On this point, we reverse.

The Board's decision stated that the permanence of the replacements was an affirmative defense that SKS was required to raise, and that since SKS did not prove the permanence of the replacements, they would be deemed temporary. The Board relies on *Medallion Kitchens, Inc. v. NLRB*, 806 F.2d 185 (8th Cir.1986), *cert. denied*, 481 U.S. 1037, 107 S.Ct. 1973, 95 L.Ed.2d 813 (1987). The issue in *Medallion* was whether the Board's General Counsel had conceded that replacements were permanent, where General Counsel had been silent on the issue. *Id.* at 189. In the instant case, however, the Board's General Counsel did not remain silent, but instead explicitly conceded in its brief to the Board that the replacements were permanent. General Counsel stated that "beginning around May 6, [Respondent] proceeded to hire *permanent replacements* for the strikers....." General Counsel went on to say that if the strikers were deemed to be economic strikers, SKS was obligated, as of the May 9 offer to return, to reinstate only the 11 strikers who had not been replaced by that date. General Counsel alleged no violation with respect to the strikers who had been replaced, and SKS cannot be faulted for failing to defend itself where no violation was alleged.

The Board relies on *C–Line Express*, 292 NLRB No. 63 (1989), to support its declaration that replacements would be deemed temporary because SKS had not proved their permanence. In *C–Line*, the Board found strikers to be economic strikers, rather than unfair labor practice strikers. The Board then addressed the status of replacements, and the Board did *not* hold that the replacements would be deemed temporary because the employer had failed to prove their permanent status. Rather, the Board held that since the record failed to establish whether the replacements were temporary or permanent, the proper course was to remand for a determination of that issue. *Id.*, Slip. Op. at 5–6. In the instant case, however, because General Counsel conceded that the replacements were permanent, remand is unnecessary.

■ This does not end the question, however. Even if strikers have been permanently replaced at the time of their offer to return, they remain entitled to reinstatement upon the departure of replacements. *Laidlaw Corp.*, 171 NLRB 1366, 1369–70 (1968), *enf'd*, 414 F.2d 99 (7th Cir.1969), *cert. denied*, 397 U.S. 920, 90 S.Ct. 928, 25 L.Ed.2d 100 (1970). In the brief to the Board in which it characterized the replacements as permanent, General Counsel also argued that there was high turnover among the replacements. General Counsel asserted that as replacements had departed, SKS had become obligated to offer those positions to the strikers, and its failure to do so was a continuing violation of its duty to reinstate the economic strikers.

■ Resolution of this issue is necessary to determine the dates from which strikers are entitled to reinstatement and back pay. Because neither the ALJ nor the Board reached the issue of replacement departures, and because General Counsel did not make a concession on this point, we remand this issue to the Board for resolution at the compliance stage of the proceeding.

## IV. Unfair Labor Practice Based on Refusal to Bargain

The NLRA imposes on employers a duty to bargain in good faith. *See* 29 U.S.C. § 158(a)(5) & (d) (1988). The ALJ found, and the Board affirmed, that Keating's May 11 refusal to negotiate "at this time" violated the statutory requirement to negotiate in good faith.

■ SKS tries to construe this issue as a question of law deserving *de novo* review. SKS relies on the fact that in *Tomco Communications, Inc.*, this court characterized the issue of an employer's duty to negotiate in good faith as a mixed question of law and fact. 567 F.2d at 876 n. 2. However, the *Tomco* court then went on to review the question under the "substantial evidence" standard of review. *See id.* at 876–77. Further, the case on which *Tomco* relied for the proposition that good faith was a mixed question of law and fact nevertheless applied a deferential standard of review: "The question [of good faith bargaining] is one of 'mixed fact and law, [and] a court will not lightly disregard the over-all appraisal of the situation by the Labor Board....'" *NLRB v. Holmes Tuttle Broadway Ford, Inc.*, 465 F.2d 717, 719 (9th Cir.1972). Thus, following the practice of this court, we review this issue under the substantial evidence standard.

■ "In determining whether a party has negotiated in good faith, it is necessary to evaluate the entire course of bargaining and all relevant circumstances." *Hendrick Manufacturing Co.*, 287 NLRB 310 (1987). In finding that SKS failed to negotiate in good faith, the ALJ evaluated both the May 11 letter stating that SKS did not want to negotiate "at this time" and the context in which the letter was written. First, the letter stated four reasons why SKS refused to negotiate, none of which were legally adequate to support a refusal to bargain.

Second, SKS agreed to negotiate with the Union only after the Union filed unfair labor practice charges. This timing casts doubt on SKS's claim that it remained willing to negotiate at all times. In fact, when SKS agreed to negotiate in its May 20 letter, every factor listed in the May 11 letter as a reason not to negotiate still existed.

Finally, SKS had recently offered a proposal which it knew many strikers were willing to accept. Thus, the parties were no longer at a bargaining impasse that would have allowed SKS temporarily to halt bargaining. *See Hyatt Hotels Corp. d/b/a Hyatt Regency Memphis*, 296 NLRB No. 37, Slip. Op. at 54 (1989).

On this record, the ALJ's finding that SKS refused to bargain in good faith, which the Board affirmed, is supported by substantial evidence.

## V. Conversion from Economic Strike to Unfair Labor Practices Strike

■ A strike which begins as an economic strike may be converted to an unfair labor practices strike in two ways: (1) if it is expanded to include a protest over unfair labor practices, *NLRB v. Top Manufacturing Co., Inc.*, 594 F.2d 223, 225 (9th Cir. 1979); or (2) where the unfair labor practice prolonged the strike, *NLRB v. Burkart Foam, Inc.*, 848 F.2d 825, 832 & n. 6 (7th Cir.1988) (employer's failure to execute a contract embodying its agreement with the union was an unfair labor practice which by its nature prolonged the strike; thus, the strike was converted into an unfair labor practices strike). The Board found that the strike was converted to an unfair labor practices strike on two grounds.

### A. Refusal to Reinstate Strikers

■ The Board found that the refusal to reinstate the strikers "blocked the termination of the strike at a time when the Union and the striking employees had offered unconditionally to end it. Thus, by its nature, this unfair labor practice prolonged the strike."

To find conversion on this ground, it is not necessary to examine whether the Union was protesting the unfair labor practice at issue. Rather, the Board has repeatedly found that the refusal to reinstate strikers is an unfair labor practice that prolongs a

strike and thereby converts an economic strike into an unfair labor practices strike. *See, e.g., Weather Tec Corp.*, 238 NLRB 1535, 1535 (1978) ("refusal to reinstate strikers ... tended to prolong the strike and thereby converted it into an unfair labor practice strike"), *enf'd without op.*, 626 F.2d 868 (9th Cir.1980); *see also Home Insulation Service*, 255 NLRB at 313 (refusal to reinstate strikers converted strike to unfair labor practices strike). Thus, we affirm the Board's finding that SKS' refusal to reinstate the strikers prolonged the strike and thus converted the strike into an unfair labor practices strike.

### B. Notice of Conversion Allegation

■ SKS argues that the Board's finding of conversion on the ground that the refusal to reinstate the strikers prolonged the strike was improper because that charge had never been alleged or litigated. Hence, SKS alleges that the Board's finding on this issue violated due process.

We hold that SKS was afforded due process because the complaint properly alleged this issue. The complaint alleged that "[t]he Strike was caused and/or prolonged by the unfair labor practices of Respondent described herein and the Strikers are unfair labor practice strikers." One of the unfair labor practices alleged in the complaint was SKS' refusal to reinstate the strikers, starting on May 11, 1986.

On the first day of trial, the Board's General Counsel moved to amend the complaint in a manner that clarified the allegations regarding the reinstatement issue. The amended complaint alleged that the strike was prolonged by, *inter alia*, SKS' refusal to reinstate the strikers and that the strikers were unfair labor practice strikers. SKS was given an opportunity to object to the proposed amendment and chose not to do so.

Thus, both the complaint and the amended complaint alleged that the refusal to reinstate the strikers was an unfair labor practice that caused or prolonged the strike and contributed towards the strike's character as an unfair labor practices strike.

SKS had adequate notice of the issue and was therefore afforded due process.

### C. Conversion Based on Refusal to Negotiate

■ The Board found that the strike was also converted to an unfair labor practices strike as a result of SKS' refusal to bargain on May 11. Following receipt of Keating's May 11 letter, the Union filed unfair labor practices charges with the Board and notified Keating by telegram that the Union now considered the strike to be an unfair labor practices strike. Further, the Union changed its picket signs to reflect the fact that the strike was now an unfair labor practices strike, and the Union began distributing handbills to that effect. The telegram and handbills both mentioned SKS' refusal to bargain as one of the unfair labor practices the Union was protesting. The ALJ noted these statements by the Union and found the strike to be an unfair labor practice strike in protest of SKS' refusal to bargain. The Board affirmed this finding.

Unfair labor practices alone do not convert a strike from an economic strike into an unfair labor practices strike. Rather, the Board must establish that the unlawful conduct was at least one factor in causing the strike to continue. The unfair labor practice does not need to be the sole, or even the predominant, cause of the strike's continuation in order for the strike to be characterized as an unfair labor practice strike. *C-Line Express*, 292 NLRB No. 63, slip op. at 2 (1988). In making the determination, the Board " 'may give substantial weight to the strikers' own characterization of their motive for continuing to strike after the unfair labor practice.... However, in examining the union's characterization of the purpose of the strike, the Board and the court must be wary of self-serving rhetoric of sophisticated union officials and members inconsistent with the true factual context.' " *Id.* (quoting *Soule Glass Co. v. NLRB*, 652 F.2d 1055, 1080 (1st Cir.1981)).

SKS maintains that the Board improperly accepted the Union's characterization of

the strike and that the true purpose of the strike remained economics. However, the Board was not required to find that the protest over the unfair labor practices was the sole reason for the strike; the finding of conversion was proper even if economic factors remained one cause of the strike. Based on our review of the record, we affirm the Board's finding that one purpose of the strike was to protest the refusal to negotiate, and that this protest was one factor converting the strike to an unfair labor practices strike.

### D. Was the Strike Reconverted to an Economic Strike?

■ SKS argues that if the strike became an unfair labor practices strike due to SKS' refusal to bargain, it reconverted to an economic strike upon SKS' offer to resume negotiations. However, the Board also found conversion based on SKS' refusal to reinstate strikers. Thus, even if the strike was no longer an unfair labor practices strike based on a refusal to negotiate, it was still an unfair labor practices strike based on the continuing refusal to reinstate the strikers. Therefore, the offer to resume negotiations could not have converted the strike back to an economic strike, and the Board properly declined to address this question.

### VI. *Conclusion*

We affirm the Board's holding that at the time of the Union's second unconditional offer to return to work on March 16, 1987, the strikers were unfair labor practices strikers. The strikers were thus entitled to reinstatement and back pay to that date, whether or not they had been permanently replaced. We further affirm the Board's finding that the strikers made an unconditional offer to return to work on May 9, 1986. We reverse the Board's finding that none of the strikers had been permanently replaced as of that date. Based on General Counsel's concession, we hold that the replacements hired as of May 9 were permanent replacements, and therefore SKS' refusal to reinstate the strikers was improper only with respect to those strikers whom General Counsel agreed had

not been replaced as of May 9. The Board will be bound by General Counsel's concession regarding the number of strikers so replaced. We remand for further findings as to the number of replacements who left their jobs, thus creating openings that could have been offered to strikers. To the extent that the Board finds that replacements departed and created openings that could have been offered to strikers, SKS shall be liable for reinstatement and back pay as of those dates.

The Board ordered no separate remedy for SKS' March 16, 1987 refusal to reinstate the unfair labor practice strikers, because the Board found that all strikers were entitled to reinstatement as of May 9. Because we reverse this finding, we remand for the Board to formulate a remedy for SKS' unlawful refusal to grant the strikers the reinstatement rights of unfair labor practices strikers as of March 16, 1987, if the Board should find that there are some strikers who had not become entitled to reinstatement at an earlier date.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED IN PART.**