**Frank IVALDI, et al., a California limited partnership d/b/a Sunol Valley Golf Club and Recreation Co., Petitioner–Cross–Respondent,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent–Cross–Petitioner.**

**Nos. 93–70608 and 93–70691.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 17, 1994.

Decided Feb. 23, 1995.

---

Robert M. Cassell, Sullivan, Roche & Johnson, San Francisco, CA, for petitioner-cross-respondent.

Nancy B. Hunt, N.L.R.B., Washington, DC, for respondent-cross-petitioner.

Before FARRIS, BOOCHEVER, and BRUNETTI, Circuit Judges.

BOOCHEVER, Circuit Judge:

Frank Ivaldi, et al., d/b/a Sunol Valley Golf Club and Recreation Co. ("Sunol"), petitions for review of a final order of the National Labor Relations Board ("the Board"). The Board affirmed the administrative law judge's decision that Sunol violated the National Labor Relations Act by (1) withdrawing recognition from the Hotel Employees and Restaurant Employees and Bartenders Union, Local 50 ("the Union"), (2) refusing to execute a written collective bargaining agreement after the Union accepted Sunol's prior offer, and (3) requiring striking employees to complete an application and submit to an interview before being reinstated to their employment positions. The Board cross-petitions for enforcement of its order requiring Sunol to execute a written collective bargaining agreement and to offer the striking employees immediate and full reinstatement. Because the Board's decision is supported by substantial evidence, we grant enforcement of its order.

## FACTUAL AND PROCEDURAL BACKGROUND

Sunol operates a 36–hole golf course and clubhouse. The Union represents fifteen of Sunol's employees who are food and beverage workers in Sunol's cafe and banquet business. Sunol has recognized the Union since Sunol opened in 1968, and the parties have entered into a number of successive collective bargaining agreements since that time. The most recent contract between the parties expired on June 30, 1990. Negotiations for a successor agreement began in May, 1990, and continued through January 4, 1991.

On October 9, 1990, the parties held a negotiation meeting, and Sunol presented the Union with a written offer for a collective bargaining agreement. The terms of the offer itself did not indicate that the offer would expire upon rejection by the Union. No agreement was reached, and the parties met again on October 12. Proposals were exchanged, but again the parties could not agree.

On October 16, Sunol gave the Union a one-page handwritten offer which Sunol called its "last, best and final offer." The offer itself contained no express language indicating that the offer would expire upon rejection. The Union employees voted to reject the October 16 offer and went on strike two days later.

The parties met on October 30, in the presence of a federal mediator, to attempt to resolve the strike. The terms of the October 16 offer were again discussed and rejected by the Union. The parties dispute exactly what was said at the end of the meeting. Sunol

claims that its chief negotiator told the Union that the October 16 offer was no longer valid. The Board credited the Union's testimony, however, that Sunol's negotiator actually reaffirmed the October 16 offer by stating, "You've got my offer, it's there," and that the federal mediator closed the session by stating, "The Union has the employer's offer; it's their call."

No negotiations took place until the parties met again on January 4, 1991. On that date, Sunol notified the Union that it was withdrawing recognition of the Union as the exclusive bargaining representative of the employees and that it would no longer deal with the Union. Shortly thereafter, the Union filed an unfair labor practice charge with the Board alleging that Sunol's withdrawal of recognition was unlawful. Sunol later conceded that the withdrawal of recognition was in fact unlawful.

The Board's regional officer, Nicholas Tsiliacos, investigated the charge and negotiated a settlement agreement to settle the claim. The settlement agreement, which was approved by the Board on February 21, required Sunol to bargain collectively with the Union once again and to reinstate the striking employees upon their unconditional application for reemployment.

On March 1, the Union wrote Sunol that as a result of the settlement, negotiations were once again resumed and the Union would accept Sunol's October 16 offer. The Union's letter to Sunol stated: "When bargaining left off as a result of your unfair labor practice, you had a last, best and final offer on the table. The Union accepts it...." Sunol responded that "there was no 'offer on the table,'" and Sunol refused to execute an agreement embodying the terms of the October 16 offer.

In the weeks that followed, six striking employees sent letters to Sunol making unconditional offers to return to work. Upon receiving these letters, Sunol did not immediately reinstate the employees, but instead, required the employees to complete applications and submit to interviews before returning to work.

The Union then filed a new unfair labor practice charge with the Board alleging restraint and coercion of employees, and refusal to bargain. The Board then issued an order withdrawing approval of and setting aside the settlement agreement. The case was brought before an Administrative Law Judge who found that Sunol violated various provisions of the National Labor Relations Act by refusing to execute a collective bargaining agreement embodying the terms of the October 16 offer, and by failing to reinstate immediately the striking employees who made written offers to return to work. The Board affirmed the Administrative Law Judge's decision.

## STANDARD OF REVIEW

We uphold the decisions of the Board "if its findings of fact are supported by substantial evidence and if the Board correctly applied the law." *NLRB v. General Truck Drivers, Local No. 315*, 20 F.3d 1017, 1021 (9th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 355, 130 L.Ed.2d 310 (1994). If there are two conflicting views of the evidence, the Board's findings are upheld even though we might have reached a different conclusion had the matter been before us de novo. *NLRB v. Champ Corp.*, 933 F.2d 688, 691 (9th Cir.1990) (as amended), *cert. denied*, 502 U.S. 957, 112 S.Ct. 416, 116 L.Ed.2d 437 (1991). Credibility determinations "are entitled to special deference and may only be rejected when a clear preponderance of the evidence shows they are incorrect." *Id.*

## DISCUSSION

I. *Sunol's Failure to Execute the Collective Bargaining Agreement*

The Board found that Sunol violated sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act"),[1] 29 U.S.C.

---

1. Section 8(a) of the Act provides in pertinent part:

It shall be an unfair labor practice for an employer—

(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title;

. . .

§§ 158(a)(1) and (5), by withdrawing recognition from the Union and by refusing to execute a written collective bargaining agreement embodying the terms of Sunol's October 16, 1990 offer, which was accepted by the Union on March 1, 1991.

At the hearing, Sunol conceded that its withdrawal of recognition from the Union on January 4, 1991, was unlawful. Sunol argues, however, that it did not violate the Act by failing to execute the collective bargaining agreement because Sunol's withdrawal of recognition of the Union served as a withdrawal of all previously outstanding contract offers.

■ An employer's refusal to execute a collective bargaining agreement whose terms have been agreed to by both the employer and the Union constitutes a violation of section 8(a)(5). *Local 512, Warehouse & Office Workers' Union v. NLRB,* 795 F.2d 705, 712 (9th Cir.1986). Technical rules of contract law do not control whether an agreement between the parties has been reached. *NLRB v. Donkin's Inn, Inc.,* 532 F.2d 138, 141 (9th Cir.), *cert. denied,* 429 U.S. 895, 97 S.Ct. 257, 50 L.Ed.2d 179 (1976). Therefore, as the Eighth Circuit has stated:

> [A] contract offer is not automatically terminated by the other party's rejection or counterproposal, but may be accepted within a reasonable time unless it was expressly withdrawn prior to acceptance, was expressly made contingent upon some condition subsequent, or was subject to intervening circumstances which made it unfair to hold the offeror to his bargain. Under this policy, an offer, once made, will remain on the table unless explicitly withdrawn by the offeror *or unless circumstances arise which would lead the parties to reasonably believe that the offer had been withdrawn.*

*Pepsi–Cola Bottling Co. v. NLRB,* 659 F.2d 87, 89–90 (8th Cir.1981) (emphasis added); *see also Presto Casting Co. v. NLRB,* 708 F.2d 495, 498 (9th Cir.) (adopting *Pepsi–Cola* holding), *cert. denied,* 464 U.S. 994, 104 S.Ct.

489, 78 L.Ed.2d 684 (1983). Whether the parties have reached an agreement is a factual question to be determined by the Board, *see Local 512,* 795 F.2d at 712, and we affirm such findings if they are supported by substantial evidence. *See General Truck Drivers,* 20 F.3d at 1021.

■ Sunol argues that its withdrawal of recognition of the Union constituted a withdrawal of its October 16 "last, best and final" offer because, under the *Pepsi–Cola* test, it led the parties "to reasonably believe that the offer had been withdrawn." According to Sunol, the withdrawal of recognition could have only one effect on the parties' reasonable beliefs: all previous offers were terminated because Sunol believed that the entire relationship was terminated. Therefore, Sunol maintains that no contract was formed by the Union's March 1 acceptance of Sunol's October 16 offer, because the offer was withdrawn and no longer capable of acceptance as soon as Sunol withdrew recognition of the Union. Sunol urges this court to evaluate the totality of the circumstances in determining whether Sunol could have reasonably believed that its October 16 offer was withdrawn when it withdrew recognition of the Union.

In considering the totality of the circumstances, we conclude that substantial evidence supports the Board's findings that the October 16 offer was capable of being accepted on March 1, and that the unlawful withdrawal of recognition was not a circumstance which could have led Sunol to reasonably believe that the offer had been terminated. The offer contained no express time limitations or conditions for its acceptance. Evidence in the record indicated that at the end of the October 30 meeting, Sunol notified the Union that the October 16 offer was still Sunol's current offer. No further communication was made between the parties from that date until Sunol's January 4 withdrawal of recognition of the Union. Therefore, the offer was not expressly withdrawn at any

---

(3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization ...;

. . .

(5) to refuse to bargain collectively with the representatives of his employees....

29 U.S.C. § 158(a)(1), (3) & (5).

time, nor was it expressly made contingent upon any condition subsequent.

Furthermore, Sunol's unlawful withdrawal of recognition did not constitute an intervening circumstance which would make it unfair to hold Sunol to its offer. The administrative law judge found that Sunol should be held to its offer because otherwise Sunol would be rewarded for its unlawful conduct in refusing to continue to recognize and bargain with the Union. Sunol argues, however, that the lawfulness of the withdrawal is irrelevant to the analysis of whether Sunol reasonably believed that the offer was terminated.

We find, however, that the unlawful character of the withdrawal is a circumstance which properly was considered in determining whether Sunol's beliefs were reasonable. The Board could find that it was not reasonable for Sunol to believe that it could withdraw its offer by committing an unquestionably illegal act. If Sunol was not justified in believing that its withdrawal of recognition was lawful, then it certainly was not justified in believing that the relationship between the parties would be terminated by its unlawful conduct.

Sunol has provided no specific authority for the proposition that an unlawful withdrawal of recognition constitutes a withdrawal of all prior offers. In support of its arguments, Sunol cites only *Bickerstaff Clay Prods. Co. v. NLRB*, 871 F.2d 980, 994 (11th Cir.), *cert. denied*, 493 U.S. 924, 110 S.Ct. 292, 107 L.Ed.2d 272 (1989), in which the court held that an employer did not violate the Act by withdrawing recognition of the union and refusing to execute a collective bargaining agreement after the union accepted the employer's prior offer. In *Bickerstaff*, however, the court found that the withdrawal of recognition was lawful and based on a good faith doubt that the union represented a majority of the employees. *Id.* The court held that the employer had no duty to withdraw its offer expressly when the circumstances had so changed that the employer reasonably believed that the union no longer represented the employees. These changed circumstances included several withdrawals by employees from the union, a breakdown in

union leadership, union inactivity, and violence associated with a strike. *Id.* at 986.

None of those circumstances was present in this case, and the withdrawal of recognition here was concededly unlawful. Although a lawful withdrawal of recognition may lead the parties to believe reasonably that all prior offers are terminated because the relationship between the parties is legally severed, an unlawful withdrawal provides no basis for a party to believe reasonably that the relationship has ended and that prior offers are no longer viable. Therefore, we uphold the Board's finding that Sunol's unlawful withdrawal of recognition did not constitute a withdrawal of the October 16 offer.

Sunol argues that even if the withdrawal of recognition did not terminate the offer, the offer lapsed because it had not been "accepted within a reasonable time" as required by *Pepsi–Cola*, 659 F.2d at 89. The Union here accepted Sunol's "last, best and final offer" on March 1, four months after the offer had been given. Sunol argues that this was too long a delay and that by March 1, the offer was no longer outstanding.

 The "[l]ength of time between offer and acceptance is only one of the circumstances to be considered" in determining whether a party reasonably believed that the offer had expired. *See Teamsters Local Union No. 688 v. NLRB*, 756 F.2d 659, 662 (8th Cir.1985). It is not the length of time itself which governs; rather, it is the "surrounding circumstances" in each case which determine whether the time period is reasonable. *See Worrell Newspapers, Inc.*, 232 N.L.R.B. 402, 407 (1977) (six months between offer and acceptance held reasonable).

 In this case, because Sunol unlawfully withdrew recognition from the Union, there was no communication between the parties from January 4 until the Union's March 1 acceptance of the offer. Therefore, the Board found that two months of the four-month delay between Sunol's offer and the Union's acceptance were the result of Sunol's own unlawful conduct. During the time period between the offer and the withdrawal of recognition, Sunol did not inform the Union that it believed the offer had lapsed or had

otherwise been terminated. In fact, there was evidence in the record that at the end of the October 30 meeting, Sunol's negotiator affirmed the offer by telling the Union's representatives, "You've got my offer, it's there." Sunol did not rescind its offer at the January 4 meeting. The Board considered all the circumstances of the case and found that the length of time between the offer and acceptance was not an unreasonable period for the offer to be considered open and available for acceptance. This finding was supported by substantial evidence in the record.

Therefore, we uphold the Board's finding that the October 16 offer remained viable because Sunol failed to withdraw expressly its offer prior to acceptance and because the circumstances did not indicate that Sunol could have reasonably considered the offer withdrawn. Thus, we affirm the Board's holding that Sunol violated sections 8(a)(1) and (5) of the Act by failing to execute the agreement embodying the terms of the offer.

## II. *Sunol's Failure to Reinstate the Striking Employees*

The Board found that Sunol violated sections 8(a)(1) and (3) of the Act by failing to reinstate six striking employees immediately upon their offer to return to work and by requiring them to complete employment applications and submit to interviews as a condition of reinstatement.[2]

■ The strike which began on October 19, 1990, became an unfair labor practice strike on January 4, 1991, when Sunol unlawfully withdrew recognition from the Union. An economic strike is converted to an unfair labor practice strike when the employer commits an unfair labor practice which prolongs the strike. *See SKS Die Casting & Mach., Inc. v. NLRB*, 941 F.2d 984, 991 (9th Cir. 1991). "It is well settled that the unlawful withdrawal of recognition from a union prolongs the strike because it deprives the employees of their bargaining representative and thereby precludes the possibility of reaching agreement...." *Rose Printing Co.*, 289 N.L.R.B. 252, 253 (1988); *see also*

*Wilder Constr.*, 276 N.L.R.B. 977, 982 (1985), *enforced*, 804 F.2d 1122 (9th Cir.1986).

■ Unfair labor practice strikers are entitled to immediate reinstatement upon making an unconditional offer to return to work, *see Champ Corp.*, 933 F.2d at 697, provided the employer does not have legitimate and substantial business justifications for refusing to reinstate the strikers. *See SKS Die Casting*, 941 F.2d at 988. Absent such justifications, an employer may not require striking employees to complete new applications and submit to reemployment interviews as a condition of reinstatement. *See Scalera Bus Serv., Inc.*, 210 N.L.R.B. 63, 63–64 (1974); *see also Harowe Servo Controls, Inc.*, 250 N.L.R.B. 958, 961 (1980) (employer violated Act by requiring as a precondition to reinstatement that employees fill out and return "availability" forms).

Sunol argues that it was entitled to require strikers to complete applications and submit to interviews for three reasons: (1) the settlement agreement authorized the application requirement; (2) the Board's agent, Nicholas Tsiliacos, advised Sunol that the requirement was permissible; and (3) the application requirement was supported by substantial business reasons. We find that these arguments lack merit and do not justify Sunol's failure to reinstate the striking employees unconditionally.

### A. *Sunol Was Not Entitled to Rely on the Language of a Settlement Agreement Which Was Set Aside by the Board*

■ The settlement agreement which was approved by the Board's Regional Director on February 21, 1991, provided in its "Notice to Employees" section: "WE [Sunol] WILL, within 5 days after their unconditional *application* for reemployment, offer to all striking employees reinstatement to their former positions...." (emphasis added). Sunol relies on the word "application" to justify requiring formal employment applications and interviews from the returning strikers.

The settlement agreement, however, was set aside by the Board's Regional Director

---

**2.** Sunol appeals the Board's decision only as it pertains to three of the six employees.

because Sunol failed to execute the collective bargaining agreement embodying the terms of the October 16 offer. Because we have determined that Sunol's unlawful withdrawal of recognition did not constitute a withdrawal of its offer, and that Sunol's failure to execute the collective bargaining agreement on that basis violated the Act, we agree with the Board that "the settlement was void ab initio." Therefore, Sunol is not entitled to rely on the terms of the settlement agreement because its own unlawful conduct made that agreement a nullity.

Even were we to allow Sunol to rely on the language of the settlement agreement, the term "application" is ambiguous, and there was no indication that the settlement agreement required returning strikers to fill out new formal applications and submit to employment interviews. The language could have been interpreted to mean that as soon as the returning strikers made an offer to return to work, which each of them did by writing a letter to Sunol, they would be reinstated. Therefore, the terms of the settlement agreement do not support Sunol's position.

### B. *Sunol Was Not Entitled to Rely on the Board Agent's Statements*

Sunol maintains that Board agent Tsiliacos advised Sunol by telephone that it was permissible under the settlement agreement to require returning strikers to complete applications and to submit to interviews. Therefore, according to Sunol, the Board should be estopped from proceeding against Sunol because Sunol relied on the Board agent's statements in requiring the applications and interviews.

The Board rejected this argument and found that it was "not estopped from proceeding against a respondent [employer] because of statements made by a Board agent during the investigation of a charge." *Ivaldi*, 305 N.L.R.B. 493, 495 (1991). Sunol argues, however, that Tsiliacos' statements were not made during the investigation phase of the charge, but during the negotiation of the settlement agreement. Sunol therefore contends that it was entitled to rely on those statements in believing that applica-

tions and interviews would be acceptable under the settlement agreement.

Sunol offers no authority to support the distinction it makes. Nor do we find the distinction significant. It is established law that the Board is not bound by advice given to employers by Board agents, especially when employee rights are violated pursuant to that advice. *See Martel Constr., Inc.*, 311 N.L.R.B. 921, 927 (1993), *enforced*, 35 F.3d 571 (9th Cir.1994); *see also Capitol Temptrol Corp.*, 243 N.L.R.B. 575, 589 n. 59 (1979) (Board not estopped from proceeding against employer because employer "had acted on advice received from two Board agents during several telephone calls made to the Board's Regional Office"). This principle holds true whether the advice was given during the investigation of a charge or during negotiations for settlement. *See Stokely–Van Camp, Inc.*, 130 N.L.R.B. 869, 870–71 (1961) (Board not bound by informal or personal advice received by employers from Board agents during settlement negotiations, especially because employee rights were violated pursuant to that advice).

The only authority Sunol cites in support of its argument is *Central States Mining Co.*, 224 N.L.R.B. 474 (1976). In that case, counsel for the General Counsel advised the employer and the union to sign an agreement waiving one employee's right to reinstatement. *Id.* at 475. The Regional Director approved the settlement but then later attempted to revoke the approval when the employer, relying on the waiver agreement, refused to reinstate the employee. *Id.* at 476. The Board found that the waiver agreement was valid and that the employer did not violate the settlement agreement when it refused to reinstate the employee. *Id.*

The facts in *Central States Mining* were very different from those involved in the present case. There, counsel for General Counsel was very involved in the entire process of securing the waiver from the employee. Counsel introduced the idea of a waiver agreement, drafted it, and then instructed the employee to sign it. His statements and advice with respect to the waiver agreement were shared with all the concerned parties.

Here, there was no evidence to indicate that the returning strikers were aware of the statements of Board agent Tsiliacos, nor was there any evidence that they agreed to submit to interviews and applications and to waive their rights to unconditional reinstatement.

Accordingly, we find that Sunol was not justified in relying on the advice of Tsiliacos, particularly when the employees' rights were violated pursuant to that advice. *See Stokely–Van Camp,* 130 N.L.R.B. at 871.

C. *Requiring An Application and Interview Was Not Supported By Substantial Business Reasons.*

■ Sunol argues that substantial business reasons justified requiring the returning strikers to fill out applications and submit to interviews before being reinstated. Sunol maintains that it had an interest in ascertaining whether the person applying was "the same person you remember," whether they were interested in coming back to work, whether they had experienced any physical disability, and whether they were available to work the same schedules.

There was no evidence in the record to suggest, however, that Sunol had reason to believe that any of the strikers did not want to return to work, or that they were physically unable or unavailable to perform their pre-strike jobs. · Sunol had received letters from each of the strikers offering to return to work. The Board found that these letters were "reasonably calculated to demonstrate to [Sunol] that the strikers wanted to return to their former positions and work shifts and were physically able to perform the work." Once the employees made an unconditional offer to return to work, Sunol had no right to require them to repeat that statement of interest by filling out applications and submitting to interviews. *See NLRB v. McQuaide, Inc.,* 617 F.2d 349, 354–55 (3d Cir.1980). Sunol's general manager himself conceded that it would have been "feasible" for Sunol to reinstate strikers without requiring applications and interviews.

Sunol nevertheless argues that it was justified in requiring the applications and interviews, and it relies solely on *Coca–Cola Bot-*

*tling Co.,* 269 N.L.R.B. 1101 (1984), in support of its arguments. In *Coca–Cola Bottling,* the Board found that an employer did not violate the Act by requiring former strikers to fill out an application before being reinstated. The employees had been engaged in an unfair labor practice strike for over a year and two months when they unconditionally offered to return to work. When they reported for work, the employer gave them an application and a "Notice to Employees" form which read: ·

As a former striker, you will be reinstated in accordance with the law. You are being asked to bring the Company's records up to date by filling out an application form. This does not mean that you are being treated as a new employee. The purpose of this notice is to let you know the reason for the application form and to prevent misunderstanding.

*Id.* at 1105. After completing the application, each employee was then interviewed concerning "his or her former position, correct name and address, and whether the employee was physically ready to return to work." *Id.* Sunol argues that its business reasons for requiring the applications and interviews were similar to those in *Coca–Cola Bottling,* and therefore, the requirement was justified.

Sunol's reliance on *Coca–Cola Bottling* is misplaced. The strike in that case lasted over fourteen months, and approximately eighty-five strikers made offers to return to work. *Id.* at 1106. The application forms were used to update the employer's records after a long strike that involved numerous employees. In the instant case, the strike lasted approximately five months, two of which were the result of Sunol's unlawful withdrawal of recognition, and· at most only six strikers' positions were at issue. In contrast to the situation in *Coca–Cola Bottling,* there was no need for the applications and interviews here. As the Board found, five months was "not such a lengthy period of time so as to have reasonably caused [Sunol] to believe that the strikers no longer desired to work for [Sunol]."

Furthermore, Sunol provided no "Notice to Employees" similar to that given in *Coca–Cola Bottling,* or any other explanation, to assure the strikers that the applications were

merely being used to update records and that the strikers were not being treated as new employees. We might well agree that requiring applications for such purposes is reasonable and would not constitute an unfair labor practice. In the present case, however, the Board found, and we agree, that Sunol's conduct was reasonably calculated to give the employees the impression that they were being penalized because of their protected concerted activity, and that because they had supported the Union strike they were being treated as applicants for employment, rather than as employees returning from a strike who were entitled under the Act to unconditional reinstatement.

Accordingly, we find that Sunol did not have substantial business justifications for requiring the returning strikers to complete application forms and to submit to interviews as a condition of their reinstatement. Therefore, we affirm the Board's finding that Sunol violated sections 8(a)(1) and 8(a)(3) by requiring the applications and interviews.

## CONCLUSION

For the reasons discussed above, we grant enforcement of the Board's order.

ENFORCEMENT GRANTED.