United States Court of Appeals
For the First Circuit


No. 95-1727

NATIONAL LABOR RELATIONS BOARD,

Petitioner,

v.

HARDING GLASS COMPANY, INC.,

Respondent.



ON APPLICATION FOR ENFORCEMENT OF AN ORDER OF THE

NATIONAL LABOR RELATIONS BOARD


Before

Selya, Circuit Judge, 
Aldrich and Coffin, Senior Circuit Judges. 



Charles Donnelly, Supervisory Attorney, Joseph J. Jablonski, 
Jr., Attorney, Frederick L. Feinstein, General Counsel, Linda 
Sher, Associate General Counsel, Aileen A. Armstrong, Deputy 
Associate General Counsel, for petitioner.
Robert Weihrauch for respondent. 


March 27, 1996


COFFIN, Senior Circuit Judge. The National Labor Relations 

Board seeks enforcement of its order finding that Harding Glass

Company committed a series of unfair labor practices and that an

economic strike against the Company was converted to an unfair

labor practice strike following Harding's unilateral

implementation of its final offer. We affirm most of the Board's

order but conclude that the record lacks substantial evidence to

support its finding that the strike was converted. We therefore

grant in part, and deny in part, the Board's application for

enforcement.1

I. Background 

Harding Glass ("the Company") is a small business in

Worcester, Massachusetts that specializes in auto glass

replacement, small construction and other similar glass-related

projects. In mid-1993, when the events relevant to this case

began, the Company employed three glassworkers and two glaziers.

The glaziers were more highly paid and performed more skilled

work. The Company and the Union that represented these five

workers, Glaziers Local 1044 of the International Brotherhood of

Painters and Allied Trades, AFL-CIO ("the Union"), had a

 

1 The Company does not challenge several of the Board's
findings of violation of 8(a)(1) of the National Labor
Relations Act, 29 U.S.C. 158(a)(1), including that (1) it
interfered in the Board's investigation of unfair labor practice
charges; (2) that it threatened employees with discharge and
promised them higher wages in order to discourage them from
supporting or remaining members of the Union; (3) and that it
encouraged and assisted employees in the filing of a
decertification petition.

-2-

longstanding collective bargaining arrangement through a multi-

employer association, the GlassEmployers Group of Greater Boston.

The most recent agreement signed by the Company and the

Union had an expiration date of October 16, 1993. On June 30,

the Company's president, Mark Goldstein, notified the Union that

he wished to negotiate a separate agreement to replace the group

contract that was expiring. Goldstein was concerned that his

company was not competitive in the Worcester area because other

glass shops there were not paying the much higher Union wage and

benefits.

The Union agreed to negotiate separately, and three

meetings, each lasting about one hour, eventually were held. The

Company proposed a one-year agreement that included substantial

reductions in wages and benefits for the glaziers and an increase

in the top rate for glassworkers, but with cuts in their benefits

as well. During the discussions, the Union's business manager

suggested techniques for cutting the Company's costs, the most

significant of which involved using the lower-paid glassworkers

to do much of the work that the Company currently was paying

glaziers to do. Goldstein maintained that he could not rely on

glassworkers to do the skilled work normally done by glaziers.

On October 17, the glaziers rejected the Company's offer and

voted to strike and establish a picket line, which they did the

next day. The three glassworkers did not attend the meeting

scheduled to discuss the Company's proposal to them, but they

agreed not to cross the glaziers' picket line. The message sent

-3-

to the Company rejecting its offer stated that the Union was

"ready and willing to continue negotiations."

On October 22, Goldstein met with the three glassworkers and

offered them the terms that had been contained in his proposal to

the Union. The same day, the third negotiating session took

place. No new proposals were made, but the parties again

discussed the Union's suggestion that the Company use

glassworkers for most of its business and rely on the Union

hiring hall to provide glaziers when necessary. The business

agent testified that the meeting ended with Goldstein saying that

he would think about the Union's proposal and get back to him

about it.

The next day, however, Goldstein rejected the Union's

approach as "unacceptable," and announced that the Company was

implementing its final offer -- i.e., its original offer. The

three glassworkers resigned from the Union and returned to work

under the terms the Company had offered the Union: a small hourly

wage increase, no pension and annuity benefits, modified health

benefits, and fewer holidays. 

No further negotiating sessions were held. The picket line

remained in effect through December and, so far as the record

indicates, the strike has to this date not been settled. The

Union filed unfair labor practice charges against the Company,

and, following a two-day hearing, an ALJ found multiple

violations of the National Labor Relations Act and also

determined that the strike was converted from an economic strike

-4-

to an unfair labor practice strike. The Board, with minor

modifications, affirmed.

On appeal, Harding challenges only two of the unfair labor

practice findings: that Goldstein threatened employees with a

shutdown of the business if they did not get rid of the Union and

that the Company unilaterally implemented changes in employment

conditions in the absence of a valid impasse in bargaining. The

Company also contends that the record fails to demonstrate that

the strike was prolonged by any of its conduct, and it therefore

urges us to reject the finding of an unfair labor practice

strike.

We find no basis for disturbing the Board's determination

with respect to either of the unfair labor practice charges, and

believe that the ALJ's discussion, as modified by the Board's

decision and Order, adequately addresses these issues.2 Our

review of the record, however, persuades us that the finding of a

 

2 We note that, with respect to the alleged threats to close
down the business, Dana Whitney, Charles Jones and James Tritone
testified that such statements were made to them. See Tr. at 
127, 205, 220. The ALJ evidently did not credit Goldstein's
assertion that he made only lawful complaints about how the high
union wages made him non-competitive. "Such credibility
determinations, of course, are for the Board rather than for us
to make, and they stand unless beyond the `bounds of reason.'"
NLRB v. Magnesium Casting Co., 668 F.2d 13, 21 (1st Cir. 1981) 
(citation omitted). See also The 3-E Company v. NLRB, 26 F.3d 1, 
3 (1st Cir. 1994).

-5-

strike conversion cannot be sustained.3 We discuss this issue

in the following section.

II. Discussion: Conversion of the Strike 

It is well-established that "[a] strike begun in support of

economic objectives becomes an unfair labor practice strike when

the employer commits an intervening unfair labor practice which

is found to make the strike last longer than it otherwise would

have," Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1079 

(1st Cir. 1981). Causation is crucial: "It must be found not

only that the employer committed an unfair labor practice after

the commencement of the strike, but that as a result the strike

was `expanded to include a protest over [the] unfair labor

practice[],' and that settlement of the strike was thereby

delayed and the strike prolonged." Id. at 1079-80 (citations 

omitted).

The General Counsel bears the burden of proving causation,

and the Board's finding of conversion must be supported by

substantial evidence. Id. at 1080. Mere conjecture will not 

 

3 The nature of the strike determines the reinstatement
rights of striking employees once the work stoppage ends. An
employer may refuse to reinstate economic strikers who have been
permanently replaced during the strike. Unfair labor practice
strikers are entitled to unconditional reinstatement, absent a
contractual or statutory provision to the contrary, and are
entitled to back pay even if they have been replaced during the
strike. See General Indus. Employees Union Local 42 v. NLRB, 951 
F.2d 1308, 1311 (D.C. Cir. 1991); Soule Glass and Glazing Co. v. 
NLRB, 652 F.2d 1055, 1105 (1st Cir. 1981).  

-6-

suffice. Facet Enterprises, Inc. v. NLRB, 907 F.2d 963, 977 

(10th Cir. 1990). "[T]o sustain a finding of conversion, there

must be some evidence in the record that the . . . employees

reacted to information of [the unfair labor practice]

substantively in a fashion which aggravated or prolonged the

strike." Id. It need not be shown, however, that the employer's 

unfair labor practice was the sole or even the primary factor in

aggravating the strike, but only that it was "a contributing

factor," NLRB v. Moore Business Forms, Inc., 574 F.2d 835, 840 

(5th Cir. 1978).

Both objective and subjective factors may be
probative of conversion. Applying objective criteria,
the Board and reviewing court may properly consider the
probable impact of the type of unfair labor practice in
question on reasonable strikers in the relevant
context. Applying subjective criteria, the Board and
court may give substantial weight to the strikers' own
characterization of their motive for continuing to
strike after the unfair labor practice. Did they
continue to view the strike as economic or did their
focus shift to protesting the employer's unlawful
conduct?

Soule Glass, 652 F.2d at 1080. 

Applying these principles to the present case renders us

unable to sustain the finding of conversion. The ALJ's

discussion of this issue comprised a single brief paragraph

within a three-page analysis of the Company's conduct. The

decision stated in conclusory language that the Company's

unilateral implementation of its final offer, together with its

unlawful threats, promises and support of a decertification

petition, "must" be found to have prolonged the strike, and

-7-

converted it "to one which must be deemed an unfair labor

practice strike." ALJ Op. at 9.4

The Board affirmed the finding of conversion, but limited

the basis for that determination to the Company's unlawful

implementation of its last offer:

Because the Respondent's initial bargaining proposal
contained significant reductions in the compensation
paid glaziers and caused them to strike on October 18,
we conclude that the unlawful implementation of these
very changes had a reasonable tendency to prolong the
strike. Accordingly, we find that the strike converted
to an unfair labor practice strike on October 25 when
the striking glaziers became aware of the Respondent's
unlawful implementation of its offer.

As their language reveals, both the ALJ and the Board

presumed that the Company's implementation of the wage package 

that had triggered the strike aggravated and prolonged the work

stoppage. Neither cites to testimony from the striking employees

or any other evidence indicating that effectuation of the terms

the employees had rejected strengthened their resolve to remain

on strike or changed their attitude about the importance of a

work stoppage in settling their differences with the Company.

 

4 We reproduce the ALJ's full discussion of the issue:

Respondent's employees commenced an economic
strike on October 18. On that same date, Respondent
commenced upon a course of unilateral changes, changes
which I have found occurred before any impasse in
bargaining. Within two to three weeks, Respondent also
began to undermine the Union's status among its
employees, with threats, promises and unlawful support
and encouragement of a decertification petition. Such
conduct, I must find, prolonged the strike, which
continues to this date, and converted that strike to
one which must be deemed an unfair labor practice
strike.

-8-

Our own reading of the hearing transcript also reveals nothing of

that nature.

We recognize that there are cases holding that some types of

unfair labor practices inevitably impact the length of a strike.

In SKS Die Casting & Machining, Inc. v. NLRB, 941 F.2d 984, 991 

(9th Cir. 1991), the court adopted the Board's conclusion that a

refusal to reinstate strikers "by its nature" prolonged the

strike because it blocked the termination of the strike at a time

when the Union and striking employees had offered unconditionally

to end it. The panel observed that "[t]o find conversion on this

ground, it is not necessary to examine whether the Union was

protesting the unfair labor practice at issue," and noted that

the Board repeatedly had found that the refusal to reinstate

strikers converts an economic strike into an unfair labor

practices strike. Id. at 991-92. 

The Eighth Circuit has made the same assumption of causation

with respect to a withdrawal of recognition. See Vulcan Hart 

Corp. (St. Louis Div.) v. NLRB, 718 F.2d 269, 276 (8th Cir. 1983) 

("Whatever goals the strikers hoped to accomplish by striking, V-

H's withdrawal of recognition clearly prolonged the strike,

because it put an end to contract negotiations."). Accord C-Line 

Express, 292 N.L.R.B. 638 (1989). Indeed, as noted above, we, 

too, have stated that the Board and reviewing court properly may

consider objective criteria and evaluate "the probable impact of

the type of unfair labor practice in question on reasonable

-9-

strikers in the relevant context." Soule Glass, 652 F.2d at 

1080.

Always, however, the principal focus must remain on the

element of causation, and specific, subjective evidence of

changed motivation may be foregone only in those instances in

which the objective factors by themselves establish unequivocally

that a conversion occurred. We do not believe that this is such

a case.

The glaziers went on strike to protest the substantially

reduced wage offer made to them. The Company's decision to

implement that offer did not directly impact the strikers; they

already were out of work and therefore were not being paid.

Thus, although we think it possible that the glaziers took a

harder line once the Company gave force to its offer by adopting

it, and perhaps increased their resolve not to end the strike

until they received a satisfactory offer, such an effect of the

Company's action is not inevitable. It is just as likely that

the Company's continuing adherence to the unacceptable proposal -

- the economic issue that triggered the strike -- was what

continued to fuel their protest.

Indeed, this case poses a somewhat unusual conversion

question because the unfair labor practice is simply a

reinforcement of the very conduct that caused the strike in the

first place, rather than a collateral matter that may have added

to the employees' dissatisfaction. The Board's obligation is to

provide some basis for an inference that, in the aftermath of the

-10-

implementation, the employees were separately motivated by that

act. Were we to accept as adequate the Board's assertion that

"[t]he probable impact" of learning that the proposal had been

implemented was "a reasonable tendency to prolong the strike," we

would seriously diminish the causation requirement.5

The cases noted above that have presumed causation are

easily distinguishable. See supra at 8-9. When a company 

refuses to reinstate employees who have offered to end a strike,

the cause and effect are obvious. Had the company not unlawfully

refused to take back those workers, the employees presumably

would have followed through on their intention to end the work

stoppage. Similarly, a withdrawal of recognition by definition

means the end of negotiations, which inevitably causes more than

just "a reasonable tendency to prolong the strike" but an actual

delay in its resolution. By contrast, when a company

unilaterally implements its final offer prematurely, we think it

less than apparent that the already ongoing strike has been

prolonged by the company's implementation of the offer rather 

 

5 The record here is notably different from that in NLRB v. 
Powell Elec. Mfg. Co., 906 F.2d 1007, 1010 (5th Cir. 1990), which 
also involved the unilateral implementation of a final offer.
There, the company began to implement its proposal after its
attorney declared at the end of a negotiating meeting that in his
opinion the parties had reached an impasse. The next day, union
members met with their attorney, who told them that he believed
impasse had not been reached and that the strike consequently had
been converted to an unfair labor practice strike. He then asked
the members if they wanted to continue the strike as an unfair
labor practice strike, and the members present voted unanimously
to do so. The strikers also modified their picket signs to
reflect that the strike was directed against company unfair
practices.

-11-

than by its persistence in offering such poor terms.6 In short,

we are reluctant to extend the principle of conversion-by-

imputing-impact beyond those situations in which the link is

unmistakable. 

It would not have been difficult for the General Counsel to

produce evidence, if it existed, that the employees were animated

at least in part by the Company's unfair labor practice. Two of

the striking glaziers testified at the hearing, as did the

Union's business manager and business representative. Although

counsel elicited testimony that the strikers were told of the

Company's action, no questions were asked concerning the impact

of that information on them. This gap is particularly

significant in the absence of any manifestation of a change in

outlook; the picket signs carried by the strikers, for example,

simply announced the strike and did not explain its basis. Cf. 

SKS Die Casting, 941 F.2d at 992 (union changed picket signs to 

reflect reaction to unfair labor practices and distributed

handbills to that effect); NLRB v. Burkart Foam, Inc., 848 F.2d 

825, 832 n.6 (7th Cir. 1988) (same). See also NLRB v. Champ 

Corp., 933 F.2d 688, 694-95 (9th Cir. 1990).7 
 

6 If the Board had made a finding of bad faith bargaining,
which it did not, this would be a different case. See C-Line 
Express, 292 N.L.R.B. 638 (1989). 

7 In Champ, the unfair labor practice at issue was the 
discharge of certain striking employees, which prompted a
unanimous vote of the union membership to remain on strike until
all strikers were reinstated. 933 F.2d at 688. In addition, the
union's negotiator informed the company's representative that the
union could not agree to deny reinstatement to any person. The
company's unlawful practice thus explicitly was identified as a

-12-

Because the record lacks evidence of "any concrete acts or

affirmations" by the employees in response to the Company's

unfair labor practice, see Facet, 907 F.2d at 977, and because we 

see no basis for presuming that the unilateral implementation of

the terms that triggered the strike necessarily prolonged or

intensified the work stoppage, we must reject the Board's finding

of conversion.8

Accordingly, the Board's application for enforcement of its

order is granted in part and denied in part.

 

barrier to settlement of the strike. 

8 The record is equally barren of evidence that other of the
Company's unfair labor practices impacted the strike.

-13-